# UNITED STATES *v.* PROVIDENCE JOURNAL CO.
## ET AL.

No. 87–65.   Argued January 20, 1988—Decided May 2, 1988

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, O'CONNOR, and SCALIA, JJ., joined. SCALIA, J., filed a concurring opinion, *post*, p. 708. STEVENS, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 708. KENNEDY, J., took no part in the consideration or decision of the case.

*Robert D. Parrillo* argued the cause for the United States. With him on the briefs was *William A. Curran.*

*Floyd Abrams* argued the cause for respondents. With him on the brief were *Edward F. Hindle* and *Joseph V. Cavanagh, Jr.**

JUSTICE BLACKMUN delivered the opinion of the Court.

The United States seeks reinstatement of a judgment of contempt against a newspaper and its executive editor for

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Bryson, Edwin S. Kneedler,* and *Douglas N. Letter;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Michael P. McDonald.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *John A. Powell, Steven R. Shapiro, Lynette Labinger, Martha Minow, Kathleen M. Sullivan,* and *Marjorie Heins;* and for the American Newspaper Publishers Association et al. by *James C. Goodale* and *John G. Koeltl.*

violating an invalid temporary restraining order against publication. Having concluded that the court-appointed prosecutor who sought certiorari and briefed and argued the case without the authorization of the Solicitor General may not represent the United States before this Court, we dismiss the writ of certiorari.

## I

On November 8, 1985, Raymond J. Patriarca, son of Raymond L. S. Patriarca, by then deceased, filed suit against the Federal Bureau of Investigation (FBI), its Director, the Department of Justice, the Attorney General of the United States, the Providence Journal Company (Journal), and WJAR Television Ten (WJAR), seeking to enjoin further dissemination of logs and memoranda compiled from 1962 to 1965 during the course of illegal electronic surveillance, see *Providence Journal Co.* v. *FBI*, 602 F. 2d 1010, 1013 (CA1 1979), cert. denied, 444 U. S. 1071 (1980), of the plaintiff's father. The complaint, as amended, was based on the Freedom of Information Act (FOIA), 5 U. S. C. § 552 (1982 ed., and Supp. IV), Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U. S. C. § 2510 *et seq.* (1982 ed., and Supp. IV), and the Fourth Amendment, and alleged that the FBI had improperly released the logs and memoranda to the Journal and WJAR pursuant to a FOIA request following the death of the senior Patriarca. The summons, complaint, and a motion for a temporary restraining order were served on the Journal on November 12, 1985. The next day counsel for the various parties gathered for a conference with the Chief Judge of the United States District Court for the District of Rhode Island. During that conference, of which, apparently, there is no transcript, the Chief Judge entered a temporary restraining order barring publication of the logs and memoranda and set a hearing for Friday,

November 15.[1]   Counsel for both the Journal and the federal defendants objected to the order.

During the evening of November 13, respondent Charles M. Hauser, executive editor of the Journal, was first advised of the restraining order.   After discussing with other Journal executives the perils of noncompliance, Hauser decided to publish a story based on the logs and memoranda.   The following day, November 14, the Journal published one article about the Patriarcas and another about the "clash" between the District Court and the Journal.   See App. 39, 18. Patriarca forthwith filed a motion to have the Journal and Hauser adjudged in criminal contempt.[2]   Id., at 223.

Patriarca, however, declined to prosecute the contempt motion,[3] and the District Court decided not to ask the United States Attorney to pursue the matter because of his representation of the federal defendants in the underlying civil action.[4]   Invoking Federal Rule of Criminal Procedure 42(b),

---

[1] The conference was held in the Chief Judge's chambers at 12:30 p.m. on November 13.   The District Court was prepared to hear argument the very next day, but, in order to accommodate counsel, set the matter for November 15 at 10 a.m.

[2] On November 15, as previously scheduled, the District Court held a hearing.   After argument by counsel, the court set a preliminary injunction hearing for Tuesday, November 19, extending the restraining order until that date.   App. 58–71.   Following the preliminary injunction hearing, the court vacated the temporary restraining order, denied preliminary injunctive relief against the Journal and WJAR, and granted a preliminary injunction against further dissemination of the logs and memoranda by the federal defendants.   Id., at 71–89.

[3] Our decision in Young v. United States ex rel. Vuitton et Fils S. A., 481 U. S. 787 (1987), in any event, would have prohibited Patriarca from taking such action.   In Young, we instructed courts to request the United States Attorney to prosecute the criminal contempt charge, and, if the United States Attorney declined, to appoint as a special prosecutor a private attorney other than the attorney for an interested party.   Id., at 801.

[4] The United States as amicus curiae, argues that the District Court's reasons were legally "insufficient" to support the decision not to ask a Government attorney to undertake the contempt prosecution, because the pros-

the District Court appointed William A. Curran of the Rhode Island Bar as "prosecuting attorney with full authority to prosecute" the pending contempt motion. App. 237–238. On Curran's application, the District Court then ordered respondents to show cause why they should not be adjudged in criminal contempt. *Id.*, at 31–32.

Following a hearing on February 10, 1986, the District Court found respondents in criminal contempt of the order entered on November 13. The court concluded that it had jurisdiction to consider whether Patriarca's statutory and Fourth Amendment claims had merit, and whether his privacy interest outweighed the Journal's First Amendment interest in publication, and thus that the temporary restraining order entered to preserve the status quo pending consideration of significant legal issues was valid, even though it subsequently had been vacated. The District Court fined the Journal $100,000 and suspended a jail sentence for Hauser, placing him on probation for 18 months and ordering that he perform 200 hours of public service. *Id.*, at 194–197.

Respondents appealed, and the United States Court of Appeals for the First Circuit reversed the judgment of contempt. *In re Providence Journal Co.*, 820 F. 2d 1342 (1986). The court found that the temporary restraining order was "transparently invalid" under the First Amendment, and thus its constitutionality could be collaterally challenged in the contempt proceedings. *Id.*, at 1353. According to the court, none of the grounds asserted in support of the order, including FOIA, Title III, and the Fourth Amendment, provided even a colorable basis for the prior restraint ordered by the District Court.

---

ecution of the Journal in order to vindicate the District Court's authority did not pose any conflict for Government attorneys. Brief for United States as *Amicus Curiae* 1, and n. 1. Because of our disposition of this case, we need not address the circumstances under which the procedures prescribed in *Young*, of requesting the appropriate prosecuting authority to pursue the contempt action, may be bypassed.

The Court of Appeals, then sitting en banc, summarily modified the panel's opinion, holding that even those subject to a transparently invalid order must make a good-faith effort to seek emergency appellate relief. It ruled, however, that the publisher may proceed to publish and challenge the constitutionality of the order in the contempt proceeding if timely access to the appellate court is not available or if a timely decision is not forthcoming. The court was not convinced that respondents could have obtained emergency relief before the publisher had to make a final decision whether to run the story the following day, and found it unfair to subject respondents to substantial sanctions for failing to follow the newly announced procedures. *In re Providence Journal Co.*, 820 F. 2d 1354 (1987).

Because of the importance of the issues, we granted certiorari. 484 U. S. 814 (1987).

## II

Before we can decide whether respondents could properly be held in contempt for violating the District Court's subsequently invalidated restraining order, we must consider respondents' motion to dismiss the writ of certiorari. It appears that the manner in which this unusual case reached us departed significantly from established practice. After the Court of Appeals reversed the judgment of contempt and, sitting en banc, modified the panel's opinion, the special prosecutor sought authorization from the Solicitor General to file a petition here for a writ of certiorari. By letter dated July 2, 1987, the Solicitor General denied that authorization. See App. to Brief for United States as *Amicus Curiae* in Response to Respondents' Motion to Dismiss 1a–2a (SG Letter). Respondents argue that, without this permission, the special prosecutor cannot proceed before this Court. While denying authorization to the special prosecutor to file or to appear on behalf of the United States, the Solicitor General questioned whether our recent decision in *Young* v. *United States ex rel.*

*Vuitton et Fils S. A.*, 481 U. S. 787 (1987), rendered such authorization unnecessary in a case concerning a criminal contempt charge prosecuted by private counsel appointed pursuant to Federal Rule of Criminal Procedure 42(b). See SG Letter. See also Brief for United States as *Amicus Curiae* 2, n. 2. We find no such implication in our decision in *Young*, and we conclude that the special prosecutor lacks the authority to represent the United States before this Court. Because he is not a party entitled to petition for certiorari under 28 U. S. C. § 1254(1), we must dismiss the heretofore-granted writ of certiorari for want of jurisdiction.[5]

## A

Title 28 U. S. C. § 518(a) provides in relevant part:

> "Except when the Attorney General in a particular case directs otherwise, the Attorney General and the Solicitor General shall conduct and argue suits and appeals in the Supreme Court . . . in which the United States is interested."

The Attorney General by regulation has delegated authority to the Solicitor General:

> "The following-described matters are assigned to, and shall be conducted, handled, or supervised by, the Solicitor General, in consultation with each agency or official concerned:
>
> "(a) Conducting, or assigning and supervising, all Supreme Court cases, including appeals, petitions for

---

[5] As we hold today, a federal statute deprives the special prosecutor of the authority to pursue the litigation in this Court on behalf of the United States when the Solicitor General declines to petition for certiorari or to authorize the filing of such a petition. We dismiss the writ even though the United States eventually expressed its "interest" in the litigation and the Solicitor General filed a brief for the United States as *amicus curiae* in support of the position taken by the special prosecutor. See *Karcher* v. *May*, 484 U. S. 72 (1987); *Diamond* v. *Charles*, 476 U. S. 54, 63–64 (1986).

and in opposition to certiorari, briefs and arguments, and . . . settlement thereof." 28 CFR § 0.20 (1987).

Thus, unless this is a case other than one "in which the United States is interested," § 518(a), it must be conducted and argued in this Court by the Solicitor General or his designee. Cf. *United States* v. *Winston,* 170 U. S. 522, 524–525 (1898); *Confiscation Cases,* 7 Wall. 454, 458 (1869).

B

The present case clearly is one "in which the United States is interested." The action was initiated in vindication of the "judicial Power *of the United States,*" U. S. Const., Art. III, § 1 (emphasis added), and it is that interest, unique to the sovereign, that continues now to be litigated in this Court. The special prosecutor seeks to reinstate a judgment of criminal contempt in a federal court, including a possible prison sentence for the individual defendant and a substantial fine for the newspaper defendant. The fact that the allegedly criminal conduct concerns the violation of a court order instead of common law or a statutory prohibition does not render the prosecution any less an exercise of the sovereign power of the United States. Indeed, just last Term, in a case much like the present one, involving a prosecution for criminal contempt under 18 U. S. C. § 401(3),[6] we flatly stated: "Private attorneys appointed to prosecute a criminal contempt action *represent the United States . . . .*" *Young* v. *United States ex rel. Vuitton et Fils S. A.,* 481 U. S., at 804 (emphasis added). See also *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 445 (1911) ("[P]roceedings at law for criminal contempt are between the public and the defendant . . .").

---

[6] Section 401 reads: "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as . . . (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

The special prosecutor and the Solicitor General argue that this case is not one "in which the United States is interested" because that phrase, as used in § 518(a), refers solely to those cases where the interests of the Executive Branch of the United States are at issue. In this litigation, the argument goes, the special prosecutor acted in support of the power of the Judicial Branch, rather than in furtherance of the Executive's constitutional responsibility, U. S. Const., Art. II, § 3, to "take Care that the Laws be faithfully executed." This suggested interpretation of § 518(a), however, presumes that there is more than one "United States" that may appear before this Court, and that the United States is something other than "the sovereign composed of the three branches . . . ." *United States* v. *Nixon*, 418 U. S. 683, 696 (1974).

We find such a proposition somewhat startling, particularly when supported by the office whose authority would be substantially diminished by its adoption, and we reject that construction as inconsistent with the plain meaning of § 518(a). It seems to be elementary that even when exercising distinct and jealously separated powers, the three branches are but "co-ordinate parts of one government." *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 406 (1928). Congress is familiar enough with the language of separation of powers that we shall not assume it intended, without saying so, to exclude the Judicial Branch when it referred to the "interest of the United States." Moreover, while there may well be matters that are uniquely Executive Branch concerns, we do not think they would be fairly described by the broad statutory language of § 518(a).

In *Young*, we reaffirmed the inherent authority of a federal court to initiate a criminal contempt proceeding for disobedience of its order, and its ability to appoint a private attorney to prosecute the contempt action. 481 U. S., at 793. This power, considered to be a part of the judicial function, is grounded first and foremost upon necessity: "The ability to punish disobedience to judicial orders is regarded as

essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other branches." *Id.*, at 796. The special prosecutor claims his appearance before this Court is necessary for the vindication of the District Court's authority. For just as the District Court would be "at the mercy of another branch in deciding whether such proceedings should be initiated," *ibid.*, if it lacked the power to appoint a private attorney to prosecute a contempt charge, the judgment vindicating the District Court's authority would be vulnerable to the Attorney General's withholding of authorization to defend it. This argument, however, overlooks the circumstances under which the special prosecutor actually came to be in a position to seek review in this Court.

When, as here, a district court's judgment of contempt has been reversed on appeal, a special prosecutor may decide to seek a writ of certiorari on the basis of his professional judgment that the court of appeals' decision merits review. See generally this Court's Rule 17. Sometimes, as apparently occurred here, the special prosecutor and the Solicitor General will disagree with respect to whether the case presents issues worthy of review by this Court. That kind of disagreement actually arises on a regular basis between the Solicitor General and attorneys representing various agencies of the United States.[7] But that disagreement does not in-

---

[7] In fact, this Court relies on the Solicitor General to exercise such independent judgment and to decline to authorize petitions for review in this Court in the majority of the cases the Government has lost in the courts of appeals. See *Andres* v. *United States*, 333 U. S. 740, 764–765, n. 9 (1948) (Frankfurter, J., concurring); McCree, The Solicitor General and His Client, 59 Wash. U. L. Q. 337, 341 (1981). See also Griswold, The Office of the Solicitor General—Representing the Interests of the United States Before the Supreme Court, 34 Mo. L. Rev. 527, 535 (1969) ("The Solicitor General has a special obligation to aid the Court as well as to serve his client. . . . In providing for the Solicitor General, subject to the direction of the Attorney General, to attend to the 'interests of the United States' in litigation, the statutes have always been understood to mean the long-

terfere with the Judiciary's power to protect itself. In this very case, before the consent of the Solicitor General ever became relevant, members of the Judiciary had decided that the District Judge erred in adjudging the defendants in contempt. Where the majority of a panel of a court of appeals or perhaps, as here, a majority of an en banc court, itself has decided in favor of the alleged contemner, the necessity that required the appointment of an independent prosecutor has faded and, indeed, is no longer present.[8]

When, on the other hand, a district court has adjudged a party in contempt, and the appellate court has affirmed, a special prosecutor has little need of the services of this Court to fulfill his or her duties. It is only if the contemner petitions this Court for a writ of certiorari that the Solicitor General need be consulted and his authorization or participation obtained to oppose the petition and defend the judgment. Under such circumstances, if the Solicitor General declines to authorize a defense of the judgment and if § 518(a) prevented the special prosecutor from proceeding, the independent ability of the Judiciary to vindicate its authority might appear to be threatened: both courts would have agreed that the contemner had disobeyed an order of the court, but the Executive's judgment to the contrary would threaten to undermine those judicial decisions. This threat, however, is inconsequential, for it is this Court, a part of the Judicial Branch, that must decide whether to exercise its discretion to review

range interests of the United States, not simply in terms of its fisc, or its success in the particular litigation, but as a government, as a people") (footnote omitted).

[8] In *Young* we emphasized:

"This principle of restraint in contempt counsels caution in the exercise of the power to appoint a private prosecutor. We repeat that the rationale for the appointment authority is necessity. If the Judiciary were completely dependent on the Executive Branch to redress direct affronts to its authority, it would be powerless to protect itself if that branch declined prosecution. . . . [T]he court will exercise its inherent power of self-protection only as a last resort." 481 U. S., at 801.

the judgment below, and it is well within this Court's authority to appoint an *amicus curiae* to file briefs and present oral argument in support of that judgment. See, *e. g., Bob Jones University* v. *United States*, 456 U. S. 922 (1982) (order appointing *amicus curiae* in support of judgment); *United States* v. *Fausto*, 480 U. S. 904 (1987) (same).

The Solicitor General argues that § 518(a) does not apply to a contempt proceeding that is initiated unilaterally by a federal court, because in *Young* this Court sustained the power of the court to appoint a private attorney to prosecute a criminal contempt charge, despite the fact that 28 U. S. C. § 516, in language certainly somewhat similar to that of § 518(a), requires such litigation to be conducted by a Government attorney:

> "Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, . . . is reserved to officers of the Department of Justice, under the direction of the Attorney General."

Also, 28 U. S. C. § 547 requires: "Except as otherwise provided by law, each United States attorney, within his district, shall . . . prosecute for all offenses against the United States." The Solicitor General concludes that *Young* necessarily implies that these broadly worded reservations of litigating authority, including § 518(a), do not apply to the case at hand.

*Young* neither expressed nor implied any such special consideration for a judicially initiated contempt proceeding. Both statutes implicated but not discussed in *Young* provide for the Attorney General's exclusive control over specified litigation *except as otherwise provided or authorized by law.* A fair reading of *Young* indicates that a federal court's inherent authority to punish disobedience and vindicate its authority is an excepted provision or authorization within the meaning of §§ 516 and 547. The "'power to punish for contempts is inherent in all courts,'" and was not first recognized by this

Court in *Young;* rather, it "'has been many times decided and may be regarded as settled law.'" *Young,* 481 U. S., at 795, quoting *Michaelson* v. *United States ex rel. Chicago, St. P., M. & O. R. Co.,* 266 U. S. 42, 65–66 (1924). Thus, contrary to the Solicitor General's intimation, *Young* did not read an exception into §§ 516 and 547; instead, *Young* is consistent with the plain language of the provisos to those sections. Section 518(a), by way of vivid contrast, contains no such proviso.[9]

---

[9] The plain language of §§ 516 and 547 resolves any conflict between the express reservations of authority over litigation therein provided and any other provision of law that vests litigation authority elsewhere. A statute that begins with "Except as otherwise provided by law" creates a general rule that applies unless contradicted in some other provision. The Court in *Young* had no reason to address the application of §§ 516 and 547. This was not because those provisions do not apply to a contempt proceeding initiated by a court, but because having reaffirmed the well-established inherent authority of a federal court to appoint a private attorney to prosecute a contempt charge, there was no conflict with the statutory requirements.

The fact that § 518(a) admits of no exception, of course, does not mean that Congress, if it so chooses, cannot exempt litigation from the otherwise blanket coverage of the statute. It does mean, however, that any such alleged exception must be scrutinized and subjected to the ordinary tools of statutory construction to determine whether Congress intended to supersede § 518(a). Indeed, Congress has enacted some provisions that suggest exceptions to the blanket coverage of § 518(a). See, *e. g.,* Federal Courts Improvement Act of 1982, § 169, 96 Stat. 51 (preserving existing authority of the Tennessee Valley Authority "to represent itself by attorneys of its choosing," while adding, see § 117, 96 Stat. 32, the United States Claims Court and the United States Court of Appeals for the Federal Circuit to the courts named in § 518(a)); Ethics in Government Act of 1978, § 601(a) as amended, 28 U. S. C. § 594(a)(9) (authorizing independent counsel to initiate and conduct prosecutions "in any court of competent jurisdiction . . . in the name of the United States"). See, as to the last cited Act, *In re Sealed Case,* 267 U. S. App. D. C. 178, 838 F. 2d 476, prob. juris. noted *sub nom. Morrison* v. *Olson,* 484 U. S. 1058 (1988). See also Stern, "Inconsistency" in Government Litigation, 64 Harv. L. Rev. 759 (1951) (discussing independent litigating authority of Interstate Commerce Commission). Without pausing here to construe the effect of any of these enactments, we note that there is no similar indication that Congress

## C

If the plain statutory language of § 518(a) were not reason enough to persuade us to accept respondents' objections and dismiss the writ of certiorari, we observe that the salutory policies that support § 518(a) could be undermined by, and anomalous consequences could result from, the approach urged upon the Court by the special prosecutor and the Solicitor General. Among the reasons for reserving litigation in this Court to the Attorney General and the Solicitor General, is the concern that the United States usually should speak with one voice before this Court, and with a voice that reflects not the parochial interests of a particular agency, but the common interests of the Government and therefore of all the people. Without the centralization of the decision whether to seek certiorari, this Court might well be deluged with petitions from every federal prosecutor, agency, or instrumentality, urging as the position of the United States, a variety of inconsistent positions shaped by the immediate demands of the case *sub judice*, rather than by longer term interests in the development of the law.

Under the procedures set out in *Young*, it seems evident that the majority of contempt cases will be prosecuted by the United States Attorney. See 481 U. S., at 801. Under the special prosecutor's interpretation of § 518(a), whereby a

---

intended any such exception for a special prosecutor appointed by a court to prosecute a contempt charge, despite the fact that Federal Rule of Criminal Procedure 42(b) reflects a longstanding practice—of which we assume Congress is aware—of private prosecutions of contempt actions. See *Young* v. *United States ex rel. Vuitton et Fils S. A.*, 481 U. S., at 793–796.

Similarly, nothing in § 518(a) precludes Members of Congress or the Judiciary from adding their views in litigation before this Court as intervenors or *amici curiae*, a practice we have long recognized, see, *e. g.*, *Bowsher* v. *Synar*, 478 U. S. 714 (1986), and which in some instances is directly authorized by statute, see, *e. g.*, 2 U. S. C. § 288e(a).

contempt citation initiated by a district court is not a case "in which the United States is interested," the United States Attorney would be free to file a petition for a writ of certiorari in this Court without the authorization of the Solicitor General. We need not speculate how a United States Attorney would resolve the conflict between his duty "to the preservation of respect for judicial authority," United States Attorneys' Manual § 9–39.318 (1984), and his duty to his superiors at the Department of Justice,[10] because we reject out of hand the interpretation of § 518(a) that creates the potential for such a conflict. Similarly, if the United States Attorney concluded that a court of appeals' decision reversing a judgment of contempt did not merit further review and declined to file a petition with this Court, it would seem to follow from the Solicitor General's interpretation, that the district judge could then appoint another special prosecutor solely for purposes of seeking certiorari and, if the writ were granted, litigating the case before this Court. See Brief for United States as *Amicus Curiae* in Response to Respondents' Motion to Dismiss 9, n. 7. But, surely, neither the force of historical practice, nor the necessity of protecting the dignity of the district court — whose judgment of contempt has been reversed on appeal — warrants attributing such power to the district judge.

## III

We conclude that a criminal contempt prosecution brought to vindicate the authority of the Judiciary and to punish disobedience of a court order is a suit "in which the United

---

[10] It may well be, as the Solicitor General contends, that even while pursuing a judicially initiated contempt prosecution, the United States Attorney remains, for all practical purposes, an officer and representative of the Executive Branch under the direction of the Attorney General. See Brief for United States as *Amicus Curiae* in Response to Respondents' Motion to Dismiss 9, n. 7. But from the standpoint of § 518(a), the Solicitor's and the special prosecutor's interpretation would seem to permit a United States Attorney to appear in this Court on behalf of the interests at stake in a contempt prosecution.

States is interested," within the meaning of § 518(a), regardless of who is appointed by the district court to prosecute the action.[11]   In this case, the special prosecutor filed a petition for a writ of certiorari without the authorization of the Solicitor General, and thus without authorization to appear on behalf of the United States.   Absent a proper representative of the Government as a petitioner in this criminal prosecution, jurisdiction is lacking and the writ of certiorari, heretofore granted, is now dismissed.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE SCALIA, concurring.

I join the opinion of the Court, which ably demonstrates that according 28 U. S. C. § 518(a) its plain meaning is fully consistent with the opinion of the Court in *Young* v. *United States ex rel. Vuitton et Fils S. A.*, 481 U. S. 787 (1987).   I continue to believe, however, that district courts possess no power, inherent or otherwise, to prosecute contemners for disobedience of court judgments and no derivative power to appoint an attorney to conduct contempt prosecutions.   See *id.*, at 825 (SCALIA, J., concurring in judgment).

JUSTICE STEVENS, with whom THE CHIEF JUSTICE joins, dissenting.

A statute enacted by the First Congress in 1789 created the office of Attorney General of the United States and de-

---

[11] How a case is captioned is of no significance to our holding.   As we have previously observed, "courts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented."   *United States* v. *ICC*, 337 U. S. 426, 430 (1949).   Thus, even if the case had not been recaptioned by the special prosecutor upon the filing of a petition in this Court to reflect the "adversary nature of the proceeding," see Petitioner's Objections to Respondents' Motion to Dismiss 2, n. 1, we would have been required to determine whether this was a case "in which the United States is interested."   A criminal contempt prosecution in federal court, however styled, is such a case.

scribed some of the responsibilities of that office. That statute provided:

> ". . . And there shall also be appointed a meet person, learned in the law, to act as attorney-general for the United States, who shall be sworn or affirmed to a faithful execution of his office; *whose duty it shall be to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned,* and to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments, and shall receive such compensation for his services as shall by law be provided." Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 93 (emphasis supplied).

The 1789 Act has been amended to make it clear that the Solicitor General has essentially the same authority to conduct litigation in this Court as does the Attorney General and that such authority may be delegated to others. See *ante,* at 699–700. In substance, however, the provision has remained unaltered for nearly 200 years; the Attorney General—and now the Solicitor General as well—is charged with conducting all litigation before this Court in which the United States is "concerned" or "interested."

Most litigation in which the United States is interested is, of course, conducted by the Executive Branch of the Government. Orderly administration requires that such litigation be conducted under the supervision and direction of a single office. Congress therefore wisely granted the Attorney General broad enough authority to accomplish that mission. It is unlikely, however, that when this statute was enacted Congress foresaw the possibility that matters such as judicial contempts, see *Young* v. *United States ex rel. Vuitton et Fils S. A.,* 481 U. S. 787 (1987), legislative contempts, see *Anderson* v. *Dunn,* 6 Wheat. 204 (1821);

*McGrain* v. *Daugherty*, 273 U. S. 135 (1927), or the need to defend a legislative veto, see *INS* v. *Chadha*, 462 U. S. 919 (1983), would present justiciable controversies in which the Congress or the Judiciary might have interests that diverge from those of the Executive Branch of the Government, but nevertheless be cases "in which the United States shall be concerned." It is equally unlikely that Congress, through amendment and more recent consideration of the provision, has perceived, much less endorsed, the view that § 518(a) should be read to place control of such litigation exclusively in the hands of the Executive Branch. Although the texts of the statutes that Congress enacted can be read to foreclose either the Congress or the Judiciary from appointing counsel to participate in litigation in this Court, we have long held that in construing a statute, we are not bound to follow the literal language of the statute—"however clear the words may appear on 'superficial examination'"—when doing so leads to "absurd," or even "unreasonable," results. *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 543–544 (1940) (citation omitted); see also *Offshore Logistics, Inc.* v. *Tallentire*, 477 U. S. 207 (1986); *O'Connor* v. *United States*, 479 U. S. 27 (1986); *California Federal Savings & Loan Assn.* v. *Guerra*, 479 U. S. 272, 284 (1987); *United States* v. *Wells Fargo Bank*, 485 U. S. 351 (1988).

Both history and common sense make clear that Congress never intended to grant the Executive Branch exclusive authority to control all litigation before this Court in which a coequal branch of government maintains a substantial, justiciable interest. As early as 1818, the House of Representatives adopted a resolution directing the Speaker of the House "to employ such counsel, as he may think proper to defend the suit brought by John Anderson against the said Thomas Dunn, and that the expenses be defrayed out of the contingent fund of the House." 33 Annals of Cong. 434 (1818). The Speaker retained William Wirt to defend the suit, which established the congressional power of legislative

contempt.  See *Anderson* v. *Dunn*, *supra*.  Although Wirt was then serving as Attorney General, Congress nonetheless deemed it necessary to retain Wirt in his private capacity and to pay him $500 to defend the suit.  See American State Papers, Misc. Vol. 2, p. 932 (1834) ("A statement of the sums paid to William Wirt, Attorney General of the United States, beyond his salary, for services not required of him by law").  Had Congress read "in which the United States shall be concerned" to extend beyond the interests of the Executive Branch, the Attorney General would already have been obliged to "prosecute" or "conduct" the suit in the Supreme Court, and no separate retainer agreement would have been necessary.  Indeed, the House Committee on the Judiciary later explained that payment above and beyond the Attorney General's salary was proper because it was provided "for services rendered which did not belong to his office, which he was in no manner bound to perform, and for which, therefore, if he did perform them, he was entitled to be paid as any other professional man would be."[1]  *Id.*, at 931.

---

[1] At the request of the House of Representatives, President Monroe transmitted to Congress "information relating to the amount of the public money paid the Attorney General, over and above his salary fixed by law . . . ."  This information was accompanied by a Presidential message that sheds further light on the early understanding of the Act of 1789, providing, in part:

"By the act of the 24th of September, 1789, instituting the office of Attorney General, it was made his duty to prosecute and conduct all suits in the Supreme Court, in which the United States should be concerned . . . .  It will be seen, therefore, by the statement communicated, that no money whatever has been paid to the Attorney General for his services in that character, nor for any duty belonging to his office, beyond his salary, as fixed by law."  American State Papers, Misc. Vol. 2, p. 931 (1834).

The House Committee agreed with the President that the nonsalary payments to Attorney General Wirt were for services beyond the scope of his statutory duties:

"That the office of Attorney General was established by the act of the 24th September, 1789, and his duty defined to be, 'to prosecute and con-

On numerous occasions since *Anderson* v. *Dunn*, Congress has seen fit to retain private counsel to represent its interests. See, *e. g.*, *Kilbourn* v. *Thompson*, 103 U. S. 168 (1881); *The Pocket Veto Case*, 279 U. S. 655 (1929); *Powell* v. *McCormack*, 395 U. S. 486 (1969); *Gravel* v. *United States*, 408 U. S. 606 (1972); *INS* v. *Chadha*, 462 U. S. 919 (1983); *Bowsher* v. *Synar*, 478 U. S. 714 (1986). Similarly, the interests of the Federal Judiciary, which are certainly interests

---

duct all suits in the Supreme Court in which the United States shall be concerned . . . .'

.        .        .        .        .

"The appointments heretofore made, and the compensation heretofore and now allowed, have had reference only to the existing constitution of the office, and the duties belonging to it, as already stated.

"It follows clearly that no Department of the Government has a right, nor ever has had a right, to call upon the Attorney General to perform any other duties; and it would be difficult to show that an officer is under a greater obligation than a private citizen to render gratuitous services to the Government, particularly where they are of a nature to be estimated and paid for.

"In the extensive and interesting concerns of the nation, it will nevertheless happen, as it has frequently happened, that the Government will have occasion for other or further legal aid than that which their officers are bound, or, in some cases, able to afford. . . .

"Where such occasional aid can be afforded by the Attorney General without interference with his proper duties, . . . there is no objection to his being employed upon the ordinary professional footing—of receiving a compensation for the service required. It was not the design of the office, as has already appeared, that he should render any other than the stated duties for the stated compensation or salary; and it was never understood or intended that the office was to deprive the officer of the right to employ his professional talents and learning for his own benefit, where that could be done without prejudice to the faithful performance of his stated duties. . . .

"In reviewing the past, then, the committee finds nothing to disapprove. Where additional professional aid has been employed, it seems to have been necessary and proper, and not to have been compensated beyond a fair and reasonable amount. Where compensation has been allowed to the Attorney General, it has been for services rendered which did not belong to his office, which he was in no manner bound to perform, and for which, therefore, if he did perform them, he was entitled to be paid as any other professional man would be. . . ." *Id.*, at 930–931.

of the United States as well, have been represented in litigation in this Court by private counsel on several occasions. See, *e. g., Will* v. *United States*, 389 U. S. 90 (1967); *Chandler* v. *Judicial Council of Tenth Circuit*, 398 U. S. 74 (1970); *Will* v. *Calvert Fire Ins. Co.*, 437 U. S. 655 (1978); *Young* v. *United States ex rel. Vuitton et Fils S. A.*, 481 U. S. 787 (1987). Yet, from the time of *Anderson* v. *Dunn* until today, we have heard argument in these cases without bothering to determine whether or not the Solicitor General approved of their participation in the litigation. In addition, we have frequently appointed counsel—sometimes designated as *"amicus curiae,"* but nevertheless fully authorized to argue cases in which the United States is interested, see, *e. g., Myers* v. *United States*, 272 U. S. 52 (1926); *Bob Jones University* v. *United States*, 456 U. S. 922 (1982) (appointing counsel), 461 U. S. 574 (1983)—without asking for the approval of the Solicitor General before taking such action. Moreover, despite the fact that 28 U. S. C. § 516 contains language similar to that found in § 518(a),[2] we have confirmed the power of the Judiciary to appoint counsel to conduct litigation in which the United States is interested. See *Young* v. *United States ex rel. Vuitton et Fils S. A., supra.*

This long and previously unquestioned practice comports well with common sense. Section 518(a) directs that "[e]xcept when the Attorney General in a particular case directs otherwise, the Attorney General and the Solicitor General shall conduct and argue suits and appeals in the Supreme Court . . . in which the United States is interested." The language is mandatory. In any case in which the United States is interested, the Solicitor General *shall* argue an appeal in the Supreme Court. Of course, and quite properly so, the Solicitor General does not seek certiorari in every

---

[2] Title 28 U. S. C. § 516 provides:

"Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, . . . is reserved to officers of the Department of Justice, under the direction of the Attorney General."

case adversely affecting an interest of the United States. Instead, the Solicitor General acts strategically, choosing the most important cases and the cases in which the United States is most likely to prevail. In thus separating the wheat from the chaff, the Solicitor General makes a series of judgments as to what is in the United States' interest. As an executive officer,[3] the Solicitor General may reasonably weigh and consider the interests of the executive agencies. When faced with a difference of view between the Executive Branch and a coordinate branch of government, however, the Solicitor General faces a conflict of interest that undeniably would be intolerable if encountered in the private sector. In essence, he or she is asked to resolve conflicting interests between clients. Common sense dictates that Congress did not intend to create such a conflict in the Office of the Solicitor General.[4] Moreover, and even more compellingly so, it is unreasonable to conclude that Congress intended to abdicate to the Solicitor General and the Department of Justice the function of determining what is in the interest of the Congress or the Judiciary. Certainly, Congress did not intend that these executive offices be charged with weighing competing executive and congressional or judicial interests, with authority—absent further legislation[5]—to deny Congress and the Judiciary access to this Court.

---

[3] Title 28 U. S. C. § 501 provides that "[t]he Department of Justice is an executive department of the United States . . . ." Section 505, in turn, provides that "[t]he President shall appoint in the Department of Justice, by and with the advice and consent of the Senate, a Solicitor General, learned in the law, to assist the Attorney General in the performance of his duties."

[4] Although this conflict could be avoided if the Solicitor General were to authorize certiorari and delegate control of the litigation in every case in which a coordinate branch asserts an interest, I doubt that Congress intended that the mandatory language of § 518(a) apply to Congress and the Judiciary merely so that the Solicitor General could then simply reallocate control of the litigation back to them whenever requested to do so.

[5] In 1978, legislation was enacted creating the Office of Senate Legal Counsel. See 92 Stat. 1875, 2 U. S. C. § 288 et seq. (1982 ed. and Supp. III). Title 2 U. S. C. § 288e(a) provides: "When directed to do so . . . ,

Not only is our prior practice consistent with a common-sense reading of § 518, but it is also significant that the officer most interested in a correct interpretation of that provision— the Solicitor General—places this interpretation on its text. In his brief in this case, he submits:

"[Title] 28 U. S. C. 518(a), like the other statutes that vest the Attorney General with exclusive control over

the Counsel shall intervene or appear as amicus curiae in the name of the Senate . . . in any legal action or proceeding pending in any court of the United States . . . in which the powers and responsibilities of Congress under the Constitution of the United States are placed in issue." Section 288l further provides that "[p]ermission to intervene as a party or to appear as amicus curiae under section 288e . . . shall be of right . . . ." And § 288k relieves the Attorney General of certain representational responsibilities when notified that the Senate Counsel is handling the matter and also requires that the Attorney General "notify the Counsel with respect to any proceeding in which the United States is a party of any determination by the Attorney General or the Solicitor General not to appeal any court decision affecting the constitutionality of an Act . . . within such time as will enable the Senate to direct the Counsel to intervene as a party in such proceeding . . . ."

No similar statute provides for representation of the House of Representatives, which declined coverage under § 288. See H. R. Conf. Rep. No. 95–1756, p. 80 (1978). Moreover, it does not appear that in enacting § 288 Congress intended to create an exception to § 518(a), nor does it appear that Congress saw a need to do so. Rather, the Senate determined that "the interests of Congress as an institution make its present reliance on the ad hoc services of the Justice Department and private counsel wholly unsatisfactory." S. Rep. No. 95–170, p. 11 (1977). Representation by the Department of Justice was deemed unsatisfactory because "[t]he Department of Justice is a part of the executive branch and its first and foremost responsibility is to represent the interests of the President and the executive branch," id., at 11–12, thus creating an unacceptable conflict of interest. The continued reliance on private representation in cases involving a conflict with the Department of Justice was also rejected because of the high cost of retaining private counsel on a case-by-case basis, because of the need to maintain consistency among legal positions taken by the Senate, and because there is often insufficient time when the need for representation arises to locate and retain private counsel. See id., at 14–15. In essence, the Senate saw a need to hire in-house counsel, not a need to create an exception to § 518(a) permitting a form of legal representation that Congress has engaged in for years.

litigation, applies to cases in which the United States is 'interested' by virtue of the constitutional and statutory responsibilities of the Executive Branch—the Branch in which the Attorney General serves. Cf. *ICC* v. *Southern Ry., Co.*, 543 F. 2d 534, 536 (5th Cir. 1976) (Section 516 'not only centralizes responsibility for the conduct of public litigation but enables the President, through the Attorney General, to supervise the various policies of the executive branch')." Brief for United States as *Amicus Curiae* in Response to Respondents' Motion to Dismiss 13.

Because I agree with that interpretation of the statute, I respectfully dissent.