# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 12-1720

MENASHA CORPORATION and NEENAH-MENASHA
    SEWERAGE COMMISSION,

*Plaintiffs-Appellees*,

*v.*


UNITED STATES DEPARTMENT OF JUSTICE,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 1:11-cv-00682-WCG—**Willliam C. Griesbach**, *Chief Judge*.

ARGUED JANUARY 23, 2013—DECIDED FEBRUARY 20, 2013


Before POSNER and WILLIAMS, *Circuit Judges*, and
NORGLE, *District Judge*.[*]

POSNER, *Circuit Judge*. This appeal requires us to
decide whether the attorney work product privilege

[*] Hon. Charles R. Norgle of the Northern District of Illinois,
sitting by designation.

protects from pretrial discovery work product exchanged between Justice Department lawyers who are assigned to provide legal assistance to federal agencies that have conflicting interests.

The core of attorney work product consists of "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(A)(ii). The opposing party "shouldn't be allowed to take a free ride on the other party's research, or get the inside dope on that party's strategy, or…invite the [trier of fact] to treat candid internal assessments of a party's legal vulnerabilities as admissions of guilt." *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 768 (7th Cir. 2006); see Ronald J. Allen et al., "A Positive Theory of the Attorney-Client Privilege and the Work-Product Doctrine," 19 *J. Legal Stud*. 359, 384-86 (1990). But since the purpose of the privilege is to hide internal litigation preparations from adverse parties, disclosure of work product to such a party forfeits the privilege. 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2024, pp. 530-32 (3d ed. 2010); see *Appleton Papers, Inc. v. EPA*, 702 F.3d 1018, 1024-25 (7th Cir. 2012); *United States v. Deloitte LLP*, 610 F.3d 129, 139-43 (D.C. Cir. 2010).

In 2010 the United States, on behalf of the Environmental Protection Agency and the Department of the Interior, filed, jointly with the State of Wisconsin, a suit in a federal district court in Wisconsin against a number of public and private entities, including the

two appellees in this case; to simplify our opinion we'll pretend the two are one and call the one Menasha. The suit (*United States v. NCR Corp.*, No. 10-C-910, E.D. Wis.) charged that the defendants had polluted the 39-mile long Lower Fox River, plus 1000 square miles of Green Bay (both bodies of water in Wisconsin), with PCBs (polychlorinated biphenyls), a toxic chemical, and that by doing so they had incurred liability under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.* (the "Superfund" law). The complaint asked for declaratory and injunctive relief and for recovery of "unreimbursed costs incurred for response activities undertaken in response to the release and threatened release of hazardous substances from facilities at and near the Lower Fox River and Green Bay Superfund Site in northeastern Wisconsin (the 'Site') as well as damages for injury to, loss of, or destruction of natural resources resulting from such releases." See 42 U.S.C. §§ 9606, 9607. The total amount of money sought by the plaintiffs has been estimated (how authoritatively we don't know) at $1.5 billion. *United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011). (An appeal in the Superfund case was before us in *United States v. NCR Corp.*, 688 F.3d 833 (7th Cir. 2012), and our opinion in that case provides additional background to the present case, as do our opinions in *Whiting* and in *Appleton Papers, Inc. v. EPA*, *supra*.)

Several weeks after the Superfund suit was filed, the Justice Department submitted to the district court on behalf of the United States a proposed consent decree that it

had negotiated with the State of Wisconsin, with two of the defendants—Brown County and the City of Green Bay—and with Indian tribal trustees. (For the text of the 44-page proposed decree, see www.epa.gov/region5/cleanup/foxriver/pdf/foxriver_cd_201012.pdf (visited Feb. 4, 2013).) As part of the settlement embodied in the decree the United States offered to contribute $4.5 million to the clean up of the polluted site. It made this offer in recognition that federal agencies, including the Corps of Engineers (by dredging operations) and—ironically—the EPA itself (by sending wastepaper containing PCBs to be recycled at mills that dumped their wastes into the Lower Fox River), might have contributed to the pollution. (To simplify our discussion we ignore the other federal agencies accused of contributing to the pollution.)

With irrelevant exceptions CERCLA requires that a settlement between the United States and an accused polluter be embodied in a consent decree, 42 U.S.C. § 9622(d)(1)(A), which of course requires judicial approval. A court considering a proposed CERCLA consent decree must ensure that it was negotiated fairly—must "look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 86 (1st Cir. 1990); see also *United States v. George A. Whiting Paper Co.*, *supra*, 644 F.3d at 372; see generally Beth I.Z. Boland, "Consent Decrees Under the Superfund Amendments and Reauthorization Act of 1986: Controlling Discretion with Procedure," 1987 *U. Chi. Legal Forum* 451, 461-64.

Menasha opposes the proposed consent decree, which has not yet been approved. It also has filed counterclaims against the United States for contribution to remediation costs that Menasha would incur if found liable. Menasha can do this because the United States has waived its sovereign immunity to suit under CERCLA. 42 U.S.C. § 9620(a)(1).

Menasha contends that the federal agencies' activities increased the costs of the pollution at the Superfund site by far more than $4.5 million, which is only three-tenths of one percent of the estimated potential liability of all the polluters of the site. The smaller the government's contribution to pollution costs, the greater the liability of other polluters, such as Menasha. Although ordinarily a nonparty to a consent decree is not bound by it, a party to a Superfund decree may not be sued for contribution by anyone else. 42 U.S.C. § 9613(f)(2). Approval of the consent decree would therefore extinguish Menasha's counterclaims.

Menasha's opposition to the proposed decree is based on suspicions concerning the bona fides of the negotiations within the Justice Department that led up to the modest estimate of the government's liability. The team of lawyers in the Justice Department's Environment and Natural Resources Division that is handling the government's case is drawn from two of the Division's sections: the Environmental Enforcement Section, which represents the United States in suits to enforce environmental laws, and the Environmental Defense Section, which defends the United States from suits to enforce

those laws. The enforcement section normally represents the EPA because the EPA is an enforcer of federal environmental laws and doubtless was centrally involved in developing the government's Superfund case. The defense section would normally represent the Corps of Engineers when the Corps is accused of pollution and the EPA as well when it's accused of pollution. Menasha's counterclaims name both agencies as polluters from which it seeks contribution, though if it prevails the money will come from the federal Judgment Fund rather than from the budgets of the agencies. See 31 U.S.C. § 1304(a); *In re The Judgment Fund and Litigative Awards Under the Comprehensive Environmental Response, Compensation, and Liability Act*, 73 Comp. Gen. 46, 49, 1993 WL 505822 (Nov. 29, 1993); U.S. Treasury, Financial Management Service, *The Judgment Fund*, Nov. 9, 2012, www.fms.treas.gov/judgefund/index.html (visited Feb. 4, 2013).

Obviously the members of the Justice Department team communicate with each other in regard to the case, and often the communication takes the form of an exchange of memos and emails between team lawyers drawn from the two litigation sections. Menasha describes the sections as adversaries, as if one were a U.S. Attorney's Office (the enforcement section) and the other a white-collar criminal defense firm (the defense section), and argues that therefore the memos and emails exchanged between the sections concerning the Superfund litigation have been shared between adverse parties, resulting in a forfeiture of the Justice Department's attorney work product privilege.

At oral argument Menasha's lawyer confirmed that he wants the documents because he suspects collusion between the enforcement and defense sections. He suspects that the team drawn from them decided to understate the contribution of the federal agencies to the pollution of the Superfund site in order to minimize the expense to the government of any relief awarded in a settlement or judgment. To prove that the Justice Department was concealing the federal role in the pollution would help Menasha discredit the $4.5 million estimate of that role in the proposed consent decree. Notice, though, the paradox: Menasha's contention that the government has forfeited the attorney work product privilege is premised on the enforcement and defense sections' being adversaries, but what it really believes is that they act not in opposition to each other but collusively—that they have ganged up against it to reduce the hit that the federal fisc will take from the decree finally entered.

Rather than seek discovery under Rule 26 of the civil rules of what it contends are unprivileged communications between the two sections, Menasha filed suit under the Freedom of Information Act, 5 U.S.C. § 552, to obtain access to those communications. Concretely, it is seeking copies of 440 documents (including electronic documents), exchanged between the sections, that appear from their titles (Menasha has not been allowed to see the documents) to relate to the Superfund suit. The district judge declined to look at any of the documents, as he could have done *in camera* and thus without revealing their contents to Menasha. Nor are

they part of the appellate record. A glimpse of them would provide a richer context to Menasha's suit, but is not essential.

Because the common law privileges available to private parties in civil litigation provide defenses to Freedom of Information Act requests as well, see 5 U.S.C. § 552(b)(5); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148-49 (1975), the question is whether the government can assert attorney work product privilege in the 440 documents. The judge thought not and ordered the documents turned over to Menasha. His order was an injunction and so appealable without regard to finality, 28 U.S.C. § 1292(a)(1), though it *was* final, because it concluded Menasha's suit under the Freedom of Information Act. The judge stayed the order pending appeal. The proposed consent decree remains pending too, more than two years after it was filed, to await the outcome of this appeal.

Menasha's argument is simple: the enforcement and defense sections are adversaries; communications between adversaries are not privileged. But as Einstein is reputed to have said, "Everything should be made as simple as possible, but not simpler."

Doubtless the two sections, having prosecutorial and defense responsibilities respectively, often disagree. Maybe the Corps of Engineers is a favorite pet of the defense section, while the enforcement section identifies with the EPA—except when the EPA contributes to pollution, in which case the agency may engage the sympathy of the defense section. After all, lawyers in

each section work with employees of their "client" agencies—some documents sought by Menasha were sent not just between the sections but also to the Corps and the EPA—and they may come to identify with the missions and outlook of their respective "clients." It's true that inscribed on the Justice Department's seal is the motto "The United States wins a case whenever justice is done one of its citizens in the courts," which might seem to blunt the enforcement section's prosecutorial zeal. And true too that the defense section's stated mission is not to defend environmental suits against federal agencies *à outrance* but instead "to fairly resolve federal agency liability, thereby protecting the federal fisc against excessive claims while ensuring that the government pays its 'fair share' of environmental cleanup costs." U.S. Dept. of Justice, Environment & Natural Resources Division, "EDS History," www.justice.gov/enrd/3599.htm (visited Feb. 4, 2013). But such official blandishments are unlikely to reveal the true culture of an organization.

All this is of no moment. Neither the EPA nor the Corps of Engineers is a party to the Superfund litigation. The United States, represented by the Justice Department, is the only federal party and the lawyers in the enforcement and defense sections have no authority to determine its negotiating aim and strategy. Their recommendations, joint or several, are reviewed by the Assistant Attorney General who heads the Environment and Natural Resources Division. Her decision concerning the proposed consent decree was reviewed by the Associate Attorney General, his approval being

necessary because the settlement would cost the government more than $2 million. 28 C.F.R. §§ 0.160(a)(2), 0.161. He was the one ultimately to approve the proposed decree that would acknowledge federal liability of $4.5 million.

The situation is much the same as if a private company were sued for selling a cosmetic that erases lines from the aging face but is alleged to have frozen the eyelids of one of its consumers permanently shut. The marketing staff might urge the general counsel to settle the case, at whatever the cost, to avoid damaging publicity. The company's dermatological staff—the proud inventor of the cosmetic—might argue that the shut-eyed customer's reaction to the product was idiosyncratic if not indeed fabricated and urge the general counsel to fight the case to the death. Some of the lawyers in the general counsel's office might side with the marketers, for those lawyers are assigned to help the marketing department. Other lawyers, those assigned to defend the company against malpractice claims, might side with the dermatologists. The general counsel would decide. The fact that he would be choosing between adversaries within the company—adversaries by virtue of differences in role and perspective—would not entitle the plaintiff's malpractice lawyer to information exchanged among the defendant's battling subordinate lawyers: information about litigating strategy, about the strengths and weaknesses of the client's and adversary's cases, about possible terms of settlement—kinds of information that the work product privilege shields from an adversary. The Justice Department is entitled

to the same treatment as the private company in our example because it enjoys the same common law privileges as private litigants enjoy.

Were Menasha's position sound, the Justice Department could never shield attorney work product in a case like this—a case, not unusual, in which the federal government by virtue of its size and diversity has internal conflicts—without a crippling reorganization of the Department. Suppose the Department decided (were we to affirm the district court) that to protect its work product it must create an impermeable membrane between the enforcement section and the defense section. Each section would have to draft its own proposed consent decree. Maybe the enforcement section's decree would sock it to the government agencies believed to have contributed to the PCB pollution, and maybe the defense section's decree would go easy on them. The competing drafts would go to the Assistant Attorney General and from there to the Associate Attorney General. These officials would balance the interests bearing on the adoption of a position by the United States: the interest in strong enforcement of federal environmental law, including enforcement against federal agencies; the interest in economizing on federal expenditures; and the interest in settlement, implying a need for compromising the federal interests in order to strike a deal, which might require the government to assume a greater liability than it thought strictly merited by the facts. In making these judgments these officials would want not only to consult the lawyers in the enforcement and defense sections who

had prepared the competing proposed consent decrees; they would also want to show each section's proposal to the other section for comment. They could not do this, according to Menasha, without making those memoranda discoverable by the opposing parties in the litigation. The Justice Department's ability to formulate a position that would reconcile competing interests within our vast federal government would be severely hampered.

The two sections have no autonomy. So imagine a team of lawyers handling a case and the team decides that one of them shall be the devil's advocate and take the side of the opposing party to the lawsuit and write briefs and memos trashing his own side. He is thus cast in the role of an adversary. Does his sharing of his briefs and memos with the other members of the team forfeit the work product privilege? That would be an absurd suggestion. But how different is this case? The government has conflicting interests; its resolution of them is the face it presents to the adversary. The resolution may be wormwood to some of the government lawyers. The sections may be at loggerheads. Is there any warfare more bitter than turf warfare? Indeed the Corps and the EPA did have (though they managed to resolve) a dispute over the Superfund cleanup: the Corps complained that the EPA wanted to stop the Corps from engaging in mechanical dredging (which stirs up PCB-contaminated sediment) and that this would have a disastrous effect on shipping. Tony Walter, "Hurdles Cleared for Port of Green Bay Dredging; Work to Begin in Late May, Early June," *Green Bay Press Gazette*, Apr. 1, 2010, www.greenbaypressgazette.com/

article/20100401/GPG0108/4010619/ (visited Feb. 4, 2013). For all we know, the enforcement section, or the defense section, felt humiliated by the consent decree ultimately proposed to the court. Maybe the proposed decree drafted by one section was adopted in its entirety by the Assistant and Associate Attorneys General, and the other consigned to the paper shredder.

All this is irrelevant to work product privilege, which shields the wrangles within the client's legal team from the opposing party. The Associate Attorney General, who approved the proposed consent decree, is not a judge adjudicating a suit between the EPA on the one hand and the Corps of Engineers and a host of other federal agencies (including, confusingly enough, the EPA) on the other hand. The Superfund suit was brought not by or against (or by and against) a medley of separate federal agencies conceived of as parties. The only federal party was the United States, a single party represented by a single legal representative, the Justice Department. See 28 U.S.C. §§ 516, 519; *United States v. Providence Journal Co.*, 485 U.S. 693, 706 (1988); *The Attorney General's Role as Chief Litigator for the United States*, 6 Ops. Off. Legal Counsel (O.L.C.) 47, 1982 WL 170670 (Jan. 4, 1982). There are disputes, mainly though not only involving independent federal agencies, in which a federal agency is authorized to sue in its own name and different parts of the government may find themselves squaring off against each other as opposing parties in litigation. See, e.g., *United States v. ICC*, 337 U.S. 426, 430-31 (1949); *SEC v. Federal Labor Relations Authority*, 568 F.3d 990, 997-98 (D.C. Cir. 2009) (concurring opinion);

Michael Herz, "*United States v. United States*: When Can the Federal Government Sue Itself?" 32 *William & Mary L. Rev.* 893, 907-10 (1991); *United States v. Nixon*, 418 U.S. 683, 697 (1974). But as this is not such a case, information in the nature of attorney work product exchanged among the Department's lawyers is not information exchanged among adverse parties and is therefore privileged.

The Justice Department contends that some of the documents sought by Menasha are also protected by other common law privileges, such as the attorney client privilege and the deliberative process privilege, and also by the privilege for information the disclosure of which could interfere with federal law enforcement. 5 U.S.C. § 552(b)(7)(A). We need not consider these contentions, because all the documents at issue are protected by the work product privilege.

REVERSED.