959 F.2d 236
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles DUNBAR, Defendant-Appellant.
 No. 91-2149.
 United States Court of Appeals, Sixth Circuit.
 April 6, 1992.
 
 Before MILBURN and SUHRHEINRICH, Circuit Judiges, and TIMBERS, Senior Circuit Judge.*
 PER CURIAM.
 
 
 1
 Defendant Charles Dunbar appeals the district court's judgment entered on the jury's verdict finding him guilty of the two counts in an indictment charging him with making false statements to a government agency in violation of 18 U.S.C. § 1001[1] and theft of public monies in excess of $100 in violation of 18 U.S.C. § 641.[2] Defendant also appeals the sentence imposed by the district court.
 
 
 2
 On appeal, the issues raised by defendant are (1) whether the district court erroneously admitted into evidence prior bad acts allegedly committed by defendant, (2) whether defendant was denied effective assistance of counsel, and (3) whether the district court erroneously calculated defendant's sentence by holding defendant responsible for the entire amount of money received from Social Security and by increasing defendant's offense level for obstruction of justice and committing a crime involving more than minimal planning. For the reasons that follow, we affirm.
 
 I.
 A.
 
 3
 The grand jury returned a two-count indictment on September 24, 1990. Count one of the indictment refers to defendant's false statement on his application for social security disability benefits asserting that he is unable to work. Count two refers to the theft of almost $25,000 in social security disability benefits.
 
 
 4
 A trial was held on June 18 and 19, 1991, and defendant was subsequently convicted on both counts of the indictment. Defendant was then fined $4,000 and sentenced to serve fifteen months in a community treatment center followed by two years of supervised relief. Defendant's notice of appeal was not filed timely; however, pursuant to a stipulation between the parties, the district court extended the time for appeal for an additional eleven days. Defendant's notice of appeal was subsequently filed within that time. Accordingly, by order of this court dated November 12, 1991, we possess jurisdiction over defendant's appeal.
 
 B.
 
 5
 Defendant is a registered nurse who suffered an injury while working in November of 1982. He received workers' compensation payments from the State of Michigan, until February of 1986 when his workers' compensation benefits ceased because he was able to return to work. In March of 1986, defendant obtained substantially full-time employment with two nursing homes, La Villa and Qualicare. On both job applications, defendant listed his daughter's social security number as his own and stated that he had no disabilities or limitations which would interfere with his duties as a nurse. He also used his daughter's social security number on tax withholding forms submitted to his employers.
 
 
 6
 On May 27, 1986, two months after returning to work, defendant applied for social security disability benefits. Defendant testified that he sought disability benefits after doctors at the Veteran's Administration Hospital "suggested that I go into social security, because they didn't know if and how long I would be able to function." J.A. 117. Defendant went to the Social Security Administration ("SSA") office in Highland Park, Michigan, where a claims representative assisted defendant in completing the application form. In applying for disability benefits, defendant averred that he was disabled due to back spasms and degenerative arthritis in his left shoulder and that he was unable to do anything with his left arm.
 
 
 7
 While processing defendant's claim, the SSA received notification from the State of Michigan that defendant's workers' compensation benefits had been discontinued in February of that year because he had returned to work. When defendant was contacted by telephone on August 18, 1986, concerning his employment status, he informed SSA that it had been determined he was able to go back to work, but, in fact, he had not gone back to work. Therefore, defendant's social security disability benefits were approved. Upon the approval of the benefits, he was informed that he was to contact the SSA immediately if he had already returned to work or if he returned to work at anytime in the future.
 
 
 8
 Between March of 1986 and June of 1989, defendant worked temporarily or part-time for five separate nursing homes. The least amount he earned for any one year was $15,286.00. In every one of his employment applications, defendant averred that he had no physical disabilities which would affect the performance of his nursing duties. He also used his daughter's social security number on four of the job applications and tax withholding forms until he discontinued this practice in September of 1988. In April of 1988, defendant filed his tax returns under his own social security number.
 
 
 9
 In August of 1987 in connection with a retaliatory discharge claim defendant brought against the State of Michigan arising from loss of employment at a state hospital, defendant was questioned about his work history. In a deposition, defendant stated he had worked "a couple of times" from November of 1982 to August of 1987. J.A. 36. In August of 1988, a federal investigator questioned defendant about his employment record. Defendant told the investigator that he had not reported his employment because he thought he had a "nine-month trial work period" in which to work and receive benefits and because he "didn't want to mess with [his] social security benefits." Shortly after this interview, defendant began using his own social security number when applying for work.
 
 
 10
 From late 1986 to June of 1987, defendant and his dependent son received $24,866.10 in disability benefits to which they were not entitled. The payments to defendant's son were dependent on defendant's eligibility. Defendant has since made restitution by repaying the entire amount plus interest.
 
 
 11
 Defendant testified to the following: When he received his first disability payment, he called the SSA to inform them that he had gone back to work. He did not know the name of the person he spoke with, but he was informed of a nine-month grace period in which he was allowed to continue to receive benefits after which time his case would be reevaluated by the SSA. He decided to await instructions from the SSA.
 
 
 12
 Defendant further testified that the first time he understood he might be receiving payments unlawfully was during a deposition for his retaliatory discharge action in August of 1987. At that time, he was informed by an assistant attorney general for the State of Michigan that he was not allowed to work and receive disability benefits simultaneously. The first official word he received from the SSA about improper payments was in a letter from a case agent from the inspector general's office. Thereafter, defendant went to the Grand River field offices of the SSA in Detroit, Michigan, where he spoke with a Mr. Garcia about the disability benefits. He told Garcia about the "unauthorized disability checks" and told him he wanted them stopped. J.A. 124. However, Mr. Garcia advised him that the SSA had not officially determined whether to terminate his benefits, and, until such determination, the disability checks should be banked by direct deposit.
 
 
 13
 As of October 31, 1988, defendant did direct deposit his disability checks. Nevertheless, he continued to make withdrawals from that account. The supervisor of the SSA office in Detroit, Michigan, confirmed that a Mr. Garcia was employed in that office as a claims representative at the applicable time; however, defendant's counsel did not subpoena Garcia to testify at trial. Finally, defendant testified that sometime in 1989, he again went to the SSA office and demanded that the payments be stopped.
 
 II.
 A.
 
 14
 Defendant challenges the effectiveness of his trial counsel for failure to subpoena a potentially exculpatory witness and to conduct adequate discovery in preparation for trial. Defendant did not raise this issue below. Absent an adequate record on this issue, this court will not consider a claim of ineffective assistance of counsel not raised below. U.S. v. Daniel, No. 91-5318, 1992 WL 19465, * 2 (6th Cir. Feb. 10, 1992); U.S. v. Gonzales, 929 F.2d 213, 215 (6th Cir.1991). Such claims are "best brought by defendant in a post-conviction proceeding under 28 U.S.C. § 2255 so that the parties can develop an adequate record on the issue." Daniel, 1992 WL 19465 at * 2. Because defendant did not raise his claim of ineffective assistance of counsel below and an inadequate record exists for us to examine this issue, this claim will not be considered.
 
 
 15
 Defendant objects to the admission of "other uncharged false statements and intentional lies allegedly made by Mr. Dunbar...." Appellant's Brief at 10. However, defendant did not object at trial to this evidence. Federal Rule of Evidence 102 provides that where no objection is made at trial to evidence admitted, the proper standard of review is plain error. Plain errors are those that are "so objectionable that they should have been apparent to the trial judge, or that strike the fundamental fairness, honesty, or public reputation of the trial." U.S. v. Rodriguez, 882 F.2d 1059, 1064 (1989), cert. denied, 493 U.S. 1084 (1990).
 
 
 16
 Defendant also objects to his sentence as determined under the United States Sentencing Guidelines ("Guidelines"). The district court's application of the Guidelines is reviewed de novo. U.S. v. Edgecomb, 910 F.2d 1309, 1311 (6th Cir.1990). However, a district court's findings of fact imposed pursuant to the Guidelines are reviewed for clear error. 18 U.S.C. § 3742; U.S. v. Alvarez, 927 F.2d 300, 303 (6th Cir.), cert. denied, 111 S.Ct. 2246 (1991). Clear error is evident when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." U.S. v. Moreno, 933 F.2d 362, 374 (6th Cir.), cert. denied, 112 S.Ct. 265 (1991). In addition, the government bears the burden of proving conduct relevant to sentencing under the Guidelines by a preponderance of the evidence. Id.
 
 B.
 
 17
 Defendant objects to the admission of the following evidence: (1) his use of a false social security number on his job applications and tax withholding forms; (2) his misrepresentation to an SSA worker that he had not gone back to work at the time he was approved for benefits; and (3) his statements on job applications that he suffered no illnesses or disabilities which would prevent him from performing his duties as a nurse.
 
 
 18
 Defendant contends that these incidents constitute "prior bad acts" within the meaning of Fed.R.Evid. 404(b). Appellant's Brief at 10. Defendant further argues that these "prior bad acts" were not introduced for any proper purpose under Rule 404(b), but, rather, were erroneously introduced as evidence that defendant would act in conformity with his character and are irrelevant and unduly prejudicial. Thus, defendant concludes, he was deprived of a fair trial. For the following reasons, defendant's arguments lack merit:
 
 Rule 404(b) provides:
 
 19
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 20
 (Effective until December 1, 1991.)
 
 
 21
 In determining whether the introduction of evidence of other crimes or wrongs was properly admitted, this court must consider the following four requirements: (1) the evidence admitted must be relevant; (2) the evidence must be admitted for a proper purpose under Rule 404(b); (3) the court must determine that the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice under Fed.R.Evid. 403; and (4) upon defendant's request, the trial court must give a limiting instruction on the evidence concerning the purpose for which it was admitted under Fed.R.Evid. 105. Huddleston v. U.S., 485 U.S. 681, 691-92 (1988); U.S. v. Bakke, 942 F.2d 977, 981 (6th Cir.1991).
 
 
 22
 For purposes of Rule 404(b), evidence is only relevant where "the jury can reasonably conclude that the act occurred and that the defendant was the actor." Huddleston, 485 U.S. at 681; see also Fed.R.Evid. 104(b).[3] In addition, relevant evidence is that evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.
 
 
 23
 Based on the government's witnesses' testimony, a jury could reasonably conclude that defendant intentionally used the wrong social security number, misrepresented his physical condition to employers, and lied about his job status to the SSA. The fact that defendant disputes these conclusions or offers a different interpretation of the evidence does not render the evidence irrelevant. In addition, this evidence was admitted for the proper purposes under Rule 404(b) of showing knowledge, intent, and a plan to steal government monies. See, e.g., Rodriguez, 882 F.2d at 1064 (evidence that an individual involved in cocaine distribution with defendant retrieved cocaine from defendant's house in preparation for its distribution was properly admitted under Rule 404(b) to show intent, plan, and knowledge where defendant was charged with possession of cocaine with intent to distribute). As the government in this case succinctly states in its brief:
 
 
 24
 Defendant utilized his daughter's social security number so that his earnings, which would call his claim of disability into question, would not show up on his earnings record, which is used by the SSA to determine a claimant's proper benefit amount. His false statement to Mary Holeman in the course of her attempt to verify defendant's eligibility on August 18, 1986, denying that he had returned to work after being ruled able to work in February of that year, was also essential to secure a finding of entitlement to disability benefits. Finally, his misrepresentations regarding his lack of injury, disability or job limitations on his numerous job applications assisted him in obtaining substantial gainful employment, thereby resulting in his failure to meet the nonmedical criteria for eligibility for disability benefits.
 
 
 25
 Appellee's Brief at 8.
 
 
 26
 Moreover, because the evidence at issue was probative of elements of the charged crime, viz., knowledge and a taking of government monies, its probative value was not substantially outweighed by its prejudicial effect.[4] Finally, because defendant did not request a limiting instruction concerning the purpose of the evidence, no error occurred in the court's failure to give one. See Huddleston, 108 S.Ct. 1502. Therefore, introduction of the evidence defendant now objects to was not plain error.
 
 C.
 
 27
 Defendant makes three challenges to his sentence. In his first argument, defendant contends that the district court improperly increased his base offense level by two levels for obstruction of justice. U.S.S.G. § 3C1.1 provides for a mandatory two-level increase in the base offense level where a defendant lies about a material fact. Alvarez, 927 F.2d at 302. In the present case, the district court found that defendant lied at trial about what he told an assistant attorney general for the State of Michigan concerning his work status during a deposition taken in defendant's retaliatory discharge action. At trial, defendant testified that during the deposition taken in 1987, he told an assistant attorney general that he was working at Metro Professional Pool and at "various nursing homes" including La Villa and Qualicare while also receiving social security disability benefits. J.A. 130. He also testified at trial that at the deposition he "wanted to get over to her [the assistant attorney general], no doubt about it, that I was drawing a disability and I was working fulltime." J.A. 131.
 
 
 28
 Despite defendant's testimony at trial, the transcript of the deposition reveals that defendant actually concealed his true work status. The core substance of his deposition testimony is that between November 1982 and August 1987, he worked "a couple of times." J.A. 142. This testimony at trial was material because it bore on the question of defendant's knowledge of his deception and his intent to deceive the SSA regarding his work status while receiving disability benefits.
 
 
 29
 Defendant attempts to explain the discrepancy in his testimony by stating in his brief that an entity called Metro Professional Pool is the "umbrella employer for Qualicare, La Villa and Metro Detroit Temporary Services." Appellant's Brief at 27. He contends that since he testified in his deposition that he had worked at Metro Professional Pool, he did inform the State of Michigan regarding his true work status. However, there is no evidence whatsoever in the record that "Metro Professional Pool" is the umbrella employer for any nursing care facility.
 
 
 30
 Defendant also argues that the enhancement of his base offense level was triggered by his false statements in his deposition, and, therefore, the conduct upon which the enhancement was based did not occur in respect to the instant offense. On the contrary, as previously demonstrated, the enhancement was based on defendant's false statements at trial. In sum, defendant's arguments are entirely lacking in merit, and the district court was not clearly erroneous in determining that defendant obstructed justice requiring a two-level enhancement of his base offense level.
 
 
 31
 Defendant next argues that the district court erred in determining for sentencing purposes that defendant was responsible for the theft of over $20,000 in disability benefits, including those benefits sent to him after August 1988, when he informed a federal inspector that he was receiving disability benefits while working full-time. As a result, defendant received a six-level increase for the theft of over $20,000 of public funds pursuant to U.S.S.G. § 2B1.1. The essence of defendant's argument is that he should not be responsible for the fact that the SSA continued to send him the benefits after August of 1988 until June of 1989 because in August of 1988, he informed a federal inspector that he was working full-time and receiving disability benefits. In fact, the SSA would have been prudent to act more quickly in cutting off defendant's payments. However, the fact that the SSA did not act more quickly does not absolve defendant of his continued fraudulent receipt of public monies. The district court's finding that defendant was responsible for the entire amount of disability benefits received by defendant is not clearly erroneous.
 
 
 32
 Finally, defendant argues that the district court's finding that his crime involved more than minimal planning resulting in a two-level enhancement of his offense level is clearly erroneous. "More than minimal planning" is defined in paragraph (f) of the commentary to the Application Instructions § 1B1.1 as
 
 
 33
 more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense.
 
 
 34
 "More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will especially apply frequently in property offenses.
 
 
 35
 The essence of defendant's argument is that his crimes did not involve more than minimal planning because he made only one false statement to a government agency (count one), and he completed only one application in order to receive disability benefits (count two). In addition, defendant continues to deny that he acted with knowledge of his wrongdoing or with an intent to defraud, and asserts that on three occasions, he informed the SSA that he was working while receiving benefits. Nevertheless, the evidence supports a finding that (1) defendant knowingly and intentionally used his daughter's social security number on job applications, tax withholding forms, and his tax returns until April of 1988 in order to collect wages and avoid detection by the SSA; (2) he made false statements to the SSA at least twice, one on his application and later to an SSA worker to conceal his employment; (3) he repeatedly informed employers he was physically fit for work while simultaneously receiving disability benefits; and (4) he received thirty-five disability payments. This is ample evidence to support a finding that defendant acted with more than minimal planning. See, e.g., U.S. v. Kappes, 936 F.2d 227, 232 (6th Cir.1991) (defendant failed to report employment to appropriate government agency and to report his employment on tax returns while simultaneously receiving disability benefits). Therefore, the district court's finding that defendant engaged in more than minimal planning is not clearly erroneous.
 
 III.
 
 36
 For the foregoing reasons, the defendant's convictions and sentence are AFFIRMED in all respects.
 
 
 
 *
 Honorable William H. Timbers, Senior Circuit Judge for the United States Court of Appeals for the Second Circuit, sitting by designation
 
 
 [1]
 18 U.S.C. § 1001 provides:
 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 [2]
 18 U.S.C. § 641 provides:
 Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
 Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted--
 Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.
 
 
 [3]
 Fed.R.Evid. 104(b) provides:
 (b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.
 
 
 [4]
 Defendant argues that a "corollary principle" to the requirement that evidence of other crimes or wrongs is not unduly prejudicial is that the evidence must be "necessary" to the government's case. Appellant's Brief at 11. This argument is totally without merit. Rather, this circuit simply balances the probative value of the evidence against its potential prejudicial effect to determine if the latter substantially outweighs the former. U.S. v. Vincent, 681 F.2d 462, 465 (6th Cir.1982) ("If we conclude that there was a proper basis for admission, we must then consider whether the probative value of the evidence outweighed its potential prejudicial effects.")