**STATE of Missouri ex rel., Kari TANNENBAUM, Relator,**

v.

**The Honorable Thomas C. CLARK, Judge of the Circuit Court of Jackson County, Missouri, Respondent.**

**No. WD 45864.**

Missouri Court of Appeals,
Western District.

July 28, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
Sept. 1, 1992.

Application to Transfer Denied
Oct. 27, 1992.

Bruce W. Simon, Kansas City, for relator.

Bruce C. Houdek, Kansas City, for respondent.

Before SHANGLER, P.J., and TURNAGE and FENNER, JJ.

SHANGLER, Presiding Judge.

This is an original proceeding in prohibition to prevent the respondent circuit judge, the Honorable Thomas C. Clark, from the execution of an order of direct criminal contempt entered against the relator attorney, Kari Tannenbaum. The order adjudged the relator Tannenbaum guilty of two contempts. The first contempt was punished by a fine of $100, "immediately payable," and the second, by two days' confinement in the Jackson County Detention Center.

■■■ The relator sought and had our writ of prohibition before the execution of the orders of contempt and confinement. There is no right of appeal from an order of criminal contempt. *In re Randolph*, 474 S.W.2d 36, 39[8–10] (Mo.App.1971). Where the contemnor is committed to jail, the validity of the judgment is tested by the writ of habeas corpus. *Curtis v. Tozer*, 374 S.W.2d 557 (Mo.App.1964). Where the contemnor is ordered to jail but the judgment remains unexecuted, the validity of the judgment is tested by prohibition. *State ex rel. Burrell–El v. Autrey*, 752 S.W.2d 895, 901[6] (Mo.App.1988).

■■ The offense for which the relator attorney was ordered fined and committed was direct criminal contempt in the actual presence of the court. It is a contempt punishable by the court summarily. Rule 36.01(a); § 476.130, RSMo 1986. A contempt of court, although not a criminal prosecution in the usual sense, is a specific criminal offense, and the sentence or fine imposed is a judgment in a criminal case. *Ex parte Brown*, 530 S.W.2d 228, 230 (Mo. banc 1975); *Osborne v. Purdome*, 244 S.W.2d 1005, 1012 (Mo. banc 1951), cert. denied, 343 U.S. 953, 72 S.Ct. 1046, 96 L.Ed. 1354 (1952). "The adjudication is a conviction, and the commitment in conse-

quence thereof is execution." *In re Shull*, 221 Mo. 623, 121 S.W. 10, 11 (1909). It is in the perspective of a punitive proceeding, criminal in nature, whereby the contemnor is deprived of liberty and property, that the requirements of Rule 36.01(a) and § 474.-140 are read. *In re Shull*, 221 Mo. 623, 121 S.W. 10, 11; *Ex parte Creasy*, 243 Mo. 679, 148 S.W. 914, 922 (banc 1912).

■■ Rule 36.01(a), which compresses half of § 476.130 and all of § 476.140 into an integral guide for direct criminal contempt, provides:

A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The judgment of contempt and the order of commitment shall recite the facts and shall be signed by the judge and entered of record.

The direction of Rule 36.01(a) that *[t]he judgment of contempt shall recite the facts* is a distillation and codification of the case law developed on these sections over the years. *Ex parte Brown*, 530 S.W.2d at 231. These decisions express the principle that in criminal contempt proceedings, "the facts and circumstances constituting the offense, not mere legal conclusions, must be recited with particularity in both the judgment of contempt and the order of commitment." *Id.* That particularity must be such that a superintending court can determine from the judgment itself, without resort to intendment, inference or presumption, whether the words constitute a criminal contempt. The rule is that of strict construction in favor of the contemnor. *Ex parte Stone*, 183 S.W. 1058, 1059[3] (Mo. banc 1916); *Scott v. Davis*, 328 S.W.2d 394, 396[1–3] (Mo.App.1959). The guilt of the contemnor must appear beyond a reasonable doubt. *Curtis v. Tozer*, 374 S.W.2d 557, 581[19] (Mo.App.1964). It is well to remark that the insistence of the law for strict procedure in criminal contempt is to counterpoise the imbalances of this punitive, albeit *sui generis*, proceeding. "Judgments in contempt proceedings

are in a measure different from other judgments. They are judgments entered by one not altogether disinterested. They may not be cool, dispassionate judgments, but may be shaded by the feelings of one presiding over a court thought to have been outraged by the conduct of a person in attendance upon such court." *Ex parte Creasy*, 148 S.W. at 917[1]. Thus, in a direct contempt the contemnor is confronted by an accusation made by the judge, who is both the complainant and the adjudicator of the complaint. The accused contemnor is entitled to no notice, no written charge, no statement of particulars. "He is not entitled to a hearing in the ordinary sense of the word, and often the only record is the order the judge makes. He cannot take a change of venue or demand trial by jury. He cannot appeal. However sure we may be of the absolute integrity of the magistrate [as we are in this case] and though we accord to him every possible attribute of cold, impersonal judicial fairness, he is, as is any judge, still the person in the chair, and he *is* a human being." *Scott v. Davis*, 328 S.W.2d at 397.

The contemnor, public defender Kari Tannenbaum, was counsel for the accused Rafael P. Lopez in a criminal prosecution pending for trial that day before the Honorable Thomas C. Clark, the respondent judge. Lopez was a Cuban who did not speak or understand the English language. There was preliminary discussion at the bench as to whether the court would accept the waiver by the defendant of a trial by jury, and whether an interpreter was due him. An interpreter was allowed and one, Calderon, appeared for that purpose. The incidents of pre-trial occupied the rest of the day.

At the beginning of the second day of pretrial proceedings, the court mentioned his understanding that the defendant Lopez, that morning, "caused some difficulty in the jail." The court addressed the defendant Lopez with an explanation of "summary direct criminal contempt." The defendant responded in Spanish, and Calderon interpreted: "He wants me to tell you what they did to him." The court responded: "I'm going to hear. He's going

to have a chance." The court then summoned the five guards present at the jail incident "to come on up" so that the court could "talk to them about what happened." Elmer, co-counsel for the defendant objected to the inquiry, since the incident "didn't happen in the courtroom," and so was not relevant to the criminal proceeding. The court overruled the objection.

The five officers gave their narratives of the event. They related that as Lopez was dressing for the court appearance he was told that he could not use his personal socks, but was required to use county socks. Lopez became upset, argumentative and combative, and spit in the face of the officers and fought with them. At the conclusion of the officers' presentations, the court asked: "Okay, does Mr. Lopez like to tell me his version of this?" Attorney Tannenbaum asked the court: "Your Honor, I first inquire the purpose of this hearing." The court explained: "Well, the purpose is to decide how we're going to conduct ourselves. I asked you a question. Does he want to tell me his version or not?" Tannenbaum responded: "Yes, Your Honor, we would need an opportunity to discuss with him his Fifth Amendment right not to testify against himself." The court interrupted: "Haven't you done that already? You mean you haven't done that at this stage of the proceedings? You've not discussed his Fifth Amendment rights and we're on the verge of trial?" Tannenbaum undertook to explain that she had not done so with regard to an incident in jail. The court commented: "[I]f you haven't discussed them at this point in time, you're not fulfilling your responsibilities as a practicing lawyer in this jurisdiction." The court commented also: "And I'm not going to be lectured by you. Either you have or you haven't advised him of his Fifth Amendment rights. And if you haven't, it's a disgrace." The court continued: "All I want to know from you is simply this. Do you want to tell me his version of this fiasco or not?" The court then conditioned his decision to allow Tannenbaum's request to consult with her client, Lopez, in the witness room, on whether or not Lopez

agreed "to conduct himself in a civilized manner." Counsel responded: "Your Honor, Mr. Lopez said he would conduct himself properly, that he has not had any problems here in court, that the problems are at the jail. And he would like to go back to the witness room to have a private conversation with his attorney." The court remarked: "Okay, now you have just testified for him. You have just testified and perhaps waived his Fifth Amendment rights by telling me his version of the problems at the jail." The court added: "Young woman, I would suggest that you respond to my question. When I ask you a question, I expect an answer to it and not a 15–minute dissertation or response and an editorial on some other feature."

The court acceded to the request of counsel to interview the client in the witness room, but only in the company of the five officers from the jail. Counsel Elmer objected to the presence of the officers in the witness room "during a privileged communication." The court expressed concern that the witness would attempt to escape. Counsel Tannenbaum responded that there was no objection to "them standing outside of the witness room so that there's no possibility of escape." She asked only "for a private communication with him in the witness room." The court responded: "And I'm denying that unless you guarantee one, that he will act in a civilized way, and, two, that he will not escape." The court added: "[I]f you're not going to guarantee that, then we're going to have to protect society from such a volatile and destructive person." Counsel Tannenbaum objected: "Your Honor, I object to that characterization of Mr. Lopez. If you're denying us [i]f you're denying us a right to talk to him" The Court warned:

> Now, wait a minute. You answer my question. And if you speak—that's the third time this you've interrupted me and have been abusive to this Court. Young woman, if you do it again, we're going to have another conversation with you about contempt. Please just answer my question and address that. If you say anything again that's critical or abusive of this court and interrupt me again,

then we will discuss contempt of court for your actions. Now, that's the third time this morning you've done it. And this is your warning that if you do it again, I'm going to consider it in contempt, and we're going to deal with it right here.

The court once again asked Tannenbaum if she was "going to guarantee" that Lopez would be "a gentleman in the witness room and will not escape." Tannenbaum answered that she was not able to guarantee "what any other person than myself is able to do." The court concluded that in that case, someone was needed in the witness room while Lopez consulted with counsel, and an officer was assigned for that purpose. At the return to open court, Tannenbaum informed the court that Lopez did not want to waive any of his Fifth Amendment rights nor "to jeopardize his Sixth Amendment right to have counsel present." Counsel then asked the court for medical assistance to Lopez for cuts and bruises on his face and arms from the scuffle with the officers in the jail. The court examined Lopez, and found no need for medical attention.

The court then commenced to address Lopez personally. Counsel Tannenbaum interrupted and asked to be heard. The court warned Tannenbaum not to interrupt: "You're the one person in this courtroom that has done that repeatedly for the last two days. And I lived with it yesterday, but I'm not going to live with it today." Counsel persisted: "Judge, what you're asking this man to do—is waive his Fifth Amendment rights so that he can get medical attention." The court informed counsel, "I'm getting ready to talk to Mr. Lopez, and I'm talking to you too." He warned counsel that it was the second time, that her "tone was insolent" and "disrespectful," but that he would overlook it, but if she did it again, he was "going to have to find it contemptuous." The court then proceeded to address the defendant Lopez, and found "what happened at the jail this morning reprehensible" on the part of Lopez. He admonished Lopez that he found it "contemptuous for [him] in any

way to resist [the jail guards]," and if Lopez "continued to do these things in proximity to this courthouse," the court would find him "in criminal contempt of this court."

The court announced that the trial would commence, but before that resumption, asked which officer accompanied Lopez in the witness room to determine how Lopez behaved. Officer King responded that Lopez "was fine" and gave them no trouble. The court warned Lopez that if he disrupted the trial at any time, he would be restrained and shackled. He concluded that Lopez owed the officers an apology. Counsel Tannenbaum arose to address the court and was directed by the court to be seated. She sat down but said, "Your Honor, I object to that."

■ That gesture culminated in the two contempt of court convictions that are now the subject of our writ of prohibition. The Order of Contempt that purports to adjudicate the contempts is rescripted in every word. We have gone beyond those recitals and examined the evidence on two grounds of authority. The order of contempt by its terms incorporates "the transcript of said proceedings in full." In a proceeding by extraordinary writ to test the legality of the restraint of the contemnor convicted for criminal contempt, the superintending court that issued the writ is not conclusively bound by the recitals in the judgment, but may inquire into the determinations of fact upon which the judgment rests. *Curtis v. Tozer*, 374 S.W.2d at 571.

■ That power derives from the very nature of criminal contempt, a judgment that commits the person to prison, but from which no appeal lies. In such a case, it is the superintending power of the court, invested by the constitution, that functions to inquire into the cause of the detention. *Ex parte Clark*, 208 Mo. 121, 106 S.W. 990, 997 (1907). In the usual case, the contemnor has already been committed, so that the inquiry into the cause of detention is by the writ of habeas corpus. *See, e.g., In re Randolph*, 474 S.W.2d 36 (Mo.App.1971); *McMilian v. Rennau*, 619 S.W.2d 848 (Mo. App.1981). In the case where, as here, the

contemnor has been adjudged in contempt and ordered to detention, but the commitment is not yet executed, the writ of prohibition serves to inquire into the legality of the judgment, and so subserves the function of habeas corpus. *State ex rel. Burrell-El v. Autrey*, 752 S.W.2d at 901[5–6].

■ The inquiry of the writ in that function goes beyond simply whether the court had jurisdiction of the subject matter of the contempt and of the person of the contemnor. In order to sustain the contempt judgment, the inquiry must show that "under both the law and the facts the particular judgment could be sustained." *Ex parte Creasy*, 148 S.W. at 917. That is because the court cannot make contempt of that which is not contempt. There must be contempt in order to justify punishment for that offense. "Proof that there was in fact no contempt should avoid the judgment [of contempt]." *Id.* at 920; *Curtis v. Tozer*, 374 S.W.2d at 572. The writ of habeas corpus [or its functional equivalent, here prohibition], "which is always construed in favor of the liberty of the citizen" enables the court to look beyond the judgment and "its recitals into the evidence and circumstances upon which the court below acted" and determine whether under both the law and the facts the court had authority to enter the particular judgment of contempt. *Ex parte Howell*, 273 Mo. 96, 200 S.W. 65, 68 (1918); *Curtis v. Tozer*, 374 S.W.2d at 573–74. The order of contempt entered against the relator Kari Tannenbaum reads:

ORDER OF CONTEMPT

Now, on this *4th* day of February, 1992, the Court makes the following findings and issues the following orders.

Repeatedly and throughout preliminary proceedings on February 3, 1992, in the case of *State of Missouri v. Rafael P. Lopez*, counsel for the Defendant disrupted and delayed proceedings by interrupting the Court and opposing counsel and by responding evasively to the Court.

On the morning of February 4, 1992, a jail employee called and reported to the

Court that the Defendant, a Cuban immigrant who does not speak or understand English and is not a U.S. Citizen, had resisted officers, by kicking, screaming, striking at and repeatedly spitting on them and, was out of control. The undersigned invited the Defendant and the involved officers to Court to discuss the events and to clarify acceptable civilized conduct.

It is common knowledge that body fluids transmit AIDS and other diseases from person to person. Officers from the Department of Corrections confirmed Defendant's uncontrollable conduct as previously described. The undersigned admonished Defendant and requested Defendant to properly conduct himself, submit to requests by Correction employees and to present any grievances or requests to his attorneys for decision by the Court. Throughout these proceedings, Ms. Kari Tannenbaum frequently with insolent tone and rude behavior, interrupted the Court and others with statements and outbursts. The undersigned repeatedly requested that Ms. Tannenbaum desist from disrupting proceedings by her abrupt and disrespectful comments, but she persisted and continued to do so.

As a last resort, after repeated requests to Ms. Tannenbaum to desist from interruptions and after advising Ms. Tannenbaum that such disruptions were contemptuous and would be treated as contempt, Ms. Tannenbaum continued to disrupt and interrupt this Court which was trying to establish a code of civility and acceptable conduct by all including Defendant.

Finally, as a last resort, the undersigned determined two subsequent interruptions by Ms. Tannenbaum to be contemptuous, disrespectful to the dignity of the Court and Community and summarily punishable as criminal contempt of Court. Incorporated herein is the transcript of said proceedings in full, but for this order, the pertinent dialogue is as follows:

THE COURT: Now, we've had a discussion about what happened at the jail this morning. And, Mr. Calderon, if I go too fast, I want you to stop me. I want to communicate with Mr. Lopez. (Pause.)

I find what happened at the jail this morning reprehensible and reprehensible conduct on the part of Mr. Lopez. Now, Mr. Lopez, I need to explain to you in detail what I consider appropriate conduct. (Pause.)

I consider it inappropriate for you to fight with the jail guards. (Pause.)

I consider it inappropriate for you to spit, kick or in any way trying to strike the jail guards. (Pause.) I find it contemptuous for you in any way to resist them, (Pause) and if you continue to do these things (Pause) in proximity to this courtroom, I'll find it in criminal contempt of this Court. So please don't do that anymore. (Pause.)

I find that conduct equally unacceptable at the jail. (Pause) If you have a dispute about your clothing (pause) or if you have a dispute about anything else (pause), please, please, please do what you're told by the jail guards (pause), and talk to your lawyers and we'll set it right in this Court. (Pause.) If you want to wear your socks, ask your lawyers to ask me. (Pause.) But please don't throw a fit or a frenzy in the jail. (Pause.) That's all we're asking you to do. (Pause) Do not fight with them. Please accompany them in a civilized way (pause) and tell me through your attorneys what your beefs are. (Pause) And if you have a legitimate beef, we'll do something about it. (Pause.)

Now, that shouldn't be hard for us to do. (Pause.) If you had asked me in civilized way to wear your socks, I probably would have granted it. (Pause.) But I can't grant that when you decide yourself as judge, jury and executioner and yourself (pause) that you're going to do it your way. (Pause.) That's all I'm asking you to do (pause) is just trust the system, and we'll try to respond to reasonable requests. (Pause.)

Now, we're going to start a trial (pause) and we want bygones to be bygones. (Pause.) We want you to be comfortable here as much as possible. (Pause.) But we're not going to permit

you or anyone else to disrupt the proceedings. (Pause.)

THE COURT: Now, if he'll maintain that conduct, we'll get along fine. And if he has any beefs, tell him to bring them to me through his lawyer. He owes those officers an apology.

(Ms. Tannenbaum stands.)

THE COURT: Please be seated.

MS. TANNENBAUM: (Remains standing) Your Honor, I object to that. (Is seated.)

THE COURT: You did it. I find that contemptuous. We will address that as soon as these proceedings are over.

MS. TANNENBAUM: Your Honor, I think they have to be addressed now. You have just held me in contempt, therefore he has not a lawyer of record in this case.

MR. ELMER: Judge, at this time, if I may be allowed to intervene. The Court just stated to Ms. Tannenbaum that it will consider contempt proceedings against her—

THE COURT: That's right.

MR. ELMER: —in the future based upon this behavior. At this time we would ask the Court to stay the proceedings of this trial. I don't think the Defendant can get a fair trial at this time.

THE COURT: Would you please be seated. I'm addressing Mr. Lopez. We will discuss this in about two minutes. And if you interrupt me again—

MS. TANNENBAUM: (Loudly) You don't have authority to address him without his lawyer of record.

THE COURT: If you interrupt—that's the second proceeding that you've interrupted me now again. That's the second matter we're going to discuss in these proceedings that are going to be forthcoming.

. . . .

THE COURT: Ms. Tannenbaum, you interrupted me not once but twice after I begged you repeatedly and told you repeatedly that was contemptuous. Would you please explain to me why you interrupted me on those two occasions?

The Court finds that Ms. Tannenbaum is in criminal contempt of this Court by her conduct and disruptive interruptions.

The Court finds that Ms. Tannenbaum was repeatedly warned that such conduct, disruptions and interruptions were contemptuous, and, when given an opportunity on several occasions to explain her actions, she declined and she remained silent.

It is the judgment of this Court that punishment for the first criminal contempt of Court committed by Ms. Tannenbaum be a fine of $100.00, payable immediately to the State of Missouri.

It is the judgment of this Court that punishment for the second contempt of Court by Ms. Tannenbaum be two (2) days confinement in the Jackson County Detention Center. Accordingly, at the conclusion of proceedings in this case this week, custody of Ms. Kari Tannenbaum is committed to the Jackson County Detention Center for two (2) days.

I hereby certify that the conduct and actions of Ms. Kari Tannenbaum set forth in this Order of Contempt were committed in my presence and were seen and heard by me.

*Thomas C. Clark (signed)*
Thomas C. Clark, Judge

■ The question here is whether the "particular circumstances of [relator Tannenbaum's] offense" are set forth in the judgment of contempt and order of commitment. Section 476.140 and Rule 36.-01(a). Only actual concrete facts, and not mere legal conclusions, satisfy the requirement of particularity. *Ex parte Brown*, 530 S.W.2d at 231[1]. The recitals in the order of contempt are extensive, and for the most part are the narrative, in paraphrase, of the court's response to the jail resistance episode the opinion already describes from the transcript. The recitals, that "throughout these proceedings, Ms. Kari Tannenbaum frequently with insolent tone and rude behavior" interrupted the court, made "disrespectful comments," that "such disruptions were contemptuous," are not only conclusory, but was conduct neither charged nor adjudicated as the contempts for which the punishment was assessed.

The precise conduct that the order of contempt court recites constituted direct criminal contempt of court were two episodes of address to the court by Tannenbaum as counsel for Lopez, a defendant in a criminal prosecution. The entire recital for the first finding of guilt for criminal contempt consists of:

(Ms. Tannenbaum stands.)

THE COURT: Please be seated.

MS. TANNENBAUM: (Remains standing) Your Honor, I object to that.

(Is seated.)

THE COURT: You did it. I find that contemptuous. We will address that as soon as these proceedings are over.

The second finding of guilt for criminal contempt followed, when after the adjudication of the first contempt, the court undertook to address the defendant Lopez:

MS. TANNENBAUM: (Loudly) You don't have authority to address him without his lawyer of record.

THE COURT: If you interrupt that's the second proceeding that you've interrupted me now again. That's the second matter that we're going to discuss in these proceedings that are going to be forthcoming. ....

THE COURT: Ms. Tannenbaum, you interrupted me not once but twice after I begged you repeatedly and told you repeatedly that was contemptuous. Would you please explain to me why you interrupted me on those two occasions?

The Court finds Ms. Tannenbaum is in criminal contempt of this Court by her conduct and disruptive interruptions.

The Court finds that Ms. Tannenbaum was repeatedly warned that such conduct, disruptions and interruptions were contemptuous, and when given an opportunity on several occasions to explain her actions, she declined and remained silent.

The essential fact constituting the criminal contempt in each instance is the "interruption" of the proceedings by Ms. Tannenbaum after repeated warning that such "disruptions and interruptions were contemptuous." Those prior incidents of "contemptuous interruption" are not described in the judgment of contempt and commit-

ment. It is, of course, the legitimate role and duty of counsel to make objections, and sometimes emphatic objections, in the cause of the client. *In re Alpers*, 574 S.W.2d 427, 428[1] (Mo. banc 1978). Timely and effective objection often cannot be made without interruption. Thus, "interruption" as such does not constitute nor prove a contempt. The first incident adjudged a "disruptive interruption" was the objection by counsel Tannenbaum to the words of the court: "He [Lopez] owes those officers an apology." The second, was the objection by counsel as to the court's continued direct address to Lopez who was then, because of the contempt adjudged against Tannenbaum, without "a lawyer of record in this case." These objections were made when the client Lopez was himself under threat of criminal contempt by the court. These objections were made, also, after counsel Tannenbaum had already informed the court that Lopez did not wish to put his Fifth Amendment rights in jeopardy by submitting to the interrogations of the court, nor to compromise his Sixth Amendment right to counsel. These objections were made when the court nevertheless resumed his personal address of Lopez. The "interruptions" that constituted the adjudicated contempts were reasonably understood as reassertions by counsel of the right of her client Lopez not to make apology for the jail incident, or any other response that might incriminate him, and of his right not to proceed without representation of counsel.

 "[I]t is the right of counsel for every litigant to press his claim, even if it appears farfetched and untenable, to obtain the court's considered ruling. Full enjoyment of that right, with due allowance for the heat of controversy, will be protected by appellate courts when infringed by trial courts." *Maness v. Meyers*, 419 U.S. 449, 459 n. 7, 95 S.Ct. 584, 591 n. 7, 42 L.Ed.2d 574 (1975). But the direct order of the trial judge fixes the limits of proper advocacy. If the ruling is adverse, there is no right of counsel to resist or insult the judge. *Id.* at 458, 95 S.Ct. at 590–91. The use of summary criminal contempt to punish lawyers for advocacy that is only overly zealous, however, contradicts the principle of an

independent and assertive bar. *In re Contempt of Greenberg*, 849 F.2d 1251, 1255[7] (9th Cir.1988).

The direct order that the court imposed, that relator Tannenbaum transgressed, and that the court punished as contempt, was to "desist from disrupting proceedings by her abrupt and disrespectful comments." [Order of Contempt, page 2] The formal judgment [order] of contempt does not describe the "disrespectful comments." The "disrupting" "interruptions" were the objections Tannenbaum intermittently lodged to the course of interrogation of the defendant Lopez by the trial court, then under threat of criminal contempt, to preserve his right against self-incrimination. There is zeal and even passion in some of the objections and responses by counsel to the court, but no hint of disrespect or disobedience. Nor is there any suggestion in the record that counsel acted otherwise than in good faith in the advice to Lopez or in responses to the court. That the objections also "interrupted" the proceedings were not marks of disobedience to the orders of the court, but unavoidable incidents of legitimate advocacy.

■ The respondent judge refers to the transcript, incorporated by the order of contempt into that adjudication, to show that the relator Tannenbaum "adopted a studied and deliberate practice of interrupting the court throughout the proceedings," although "ordered not to interrupt" and "warned that her interruptions were contemptuous." Of course, the transcript can only be used to show that notwithstanding the facts recited as constituting the contempt, there was in actual fact no contempt. *Ex parte Ryan*, 607 S.W.2d 888, 892[7] (Mo.App.1980). That is because the court cannot make contempt of that which is not contempt, and proof that there was in fact no contempt avoids the judgment. *Ex parte Creasy*, 148 S.W. at 920; *Curtis v. Tozer*, 374 S.W.2d at 572. It cannot be used to show that other conduct, not specifically adjudicated by the judgment, constitutes a contempt. *Curtis v. Tozer*, 374 S.W.2d at 572. A judgment of criminal contempt, otherwise void on its face, cannot be validated by other conduct, contemptuous in fact, which is not made a part of the judgment. *Ex parte Heffron,.* 179 Mo. App. 639, 162 S.W. 652, 656–57 (1913); *Ex parte Brown*, 530 S.W.2d at 231[1].

Disorderly, contemptuous or insolent behavior committed during the court session, in the immediate view of the court, and directly tending to interrupt its proceeding or to impair the respect due its authority, constitutes a direct criminal contempt. § 476.110(1). The recitals of the order of contempt do not constitute a direct criminal contempt of court. The transcript incorporated into the order of contempt does not show that "under both the law and the facts the particular judgment could be sustained." *Ex parte Creasy*, 148 S.W. at 917. In a criminal contempt judgment guilt must be established beyond a reasonable doubt. *Osborne v. Purdome*, 250 S.W.2d 159 at 163[11] (Mo. banc 1952). In a close case "where the line between vigorous advocacy and actual obstruction defie[s] strict delineation, doubts should be resolved in favor of vigorous advocacy." *United States ex rel. Robson v. Oliver*, 470 F.2d 10, 13 (7th Cir.1972).

The order of prohibition is made permanent.

All concur.