**STATE of Missouri, ex rel. John A. PICERNO, Relator,**

v.

**The Honorable William F. MAUER, Respondent.**

No. WD 51336.

Missouri Court of Appeals, Western District.

Feb. 13, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 2, 1996.

Application to Transfer Denied May 28, 1996.

Bruce W. Simon, Jacqueline A. Cook, Kansas City, for appellant.

Amy McGowan, Asst. Pros. Atty., Jackson County, Kansas City, for respondent.

Before SPINDEN, P.J., and LAURA DENVIR STITH and SMITH, JJ.

## ORIGINAL PROCEEDING FOR WRIT OF PROHIBITION

SPINDEN, Presiding Judge.

John A. Picerno was court-appointed counsel in a criminal defense case in Jackson County circuit court on July 10, 1995, when he decided to walk out of the courtroom because the Honorable William F. Mauer refused to grant his request for a continuance. Mauer ordered him to remain, but Picerno disobeyed. Mauer declared him to be in contempt of the court and ordered authorities to jail him for 15 days. Picerno asked this court to issue a writ prohibiting enforcement of Mauer's order. We issued our preliminary writ in prohibition which we now quash.

Picerno was the third lawyer appointed by the circuit court to counsel a defendant charged with four counts of forcible sodomy, two counts of forcible rape, robbery in the first degree, two counts of kidnapping, two counts of sexual abuse, assault in the second degree, and four counts of armed criminal action. The defendant's first attorney withdrew from the case. A second attorney withdrew because of conflicts of interest when the defendant filed a complaint in federal court contending violations of his constitutional rights under 42 U.S.C. § 1983.

Mauer appointed Picerno to represent the defendant, and he entered his appearance on May 4, 1995.[1] Mauer scheduled the defendant's trial to begin the week of July 10. On June 28, Picerno asked for a continuance, but

---

1. All events in this case occurred in 1995.

Mauer denied it. At a pretrial conference on July 6, Picerno renewed his motion for a continuance. He told Mauer that he had not had sufficient time to prepare for trial and that the defendant would not get a fair trial, due process or adequate representation without a continuance. Mauer again denied a continuance.

On July 7, Picerno asked this court to issue a writ prohibiting Mauer from denying his request for a continuance. We denied the petition.

On July 10, Mauer called the case for trial. Picerno appeared with Jennifer Brewer as attorneys for the defendant. Picerno again asked for a continuance, and Mauer again denied it.

Mauer asked Picerno and the prosecutor how many persons they would need on the jury panel. Picerno replied that he could not try the case that day and would not comment on anything concerning the case. Mauer ordered the case to proceed but asked the defendant whether he had any response to Picerno's actions. He indicated to Mauer that he did not.

Mauer ordered that the jury be brought into the courtroom. This exchange then occurred between Mauer and Picerno:

MR. PICERNO: For the record, I am going to indicate to the court that I am not going to sit here through this proceeding. Whatever it is that you intend to do, I took an oath as an attorney to come into court and to represent people to the best of my ability and to provide them with at the very least, adequate representation.

THE COURT: Mr. Picerno, you will sit here during this case and if you do not, you will be found in contempt of court and you will be turned over to the Disciplinary Committee. I am telling you that you will stay here and you will do your best to represent this man as an officer of this Court.

MR. PICERNO: I understand your position and respectfully, I am going to tell you right now that I'm not going to stay in the courtroom while this process goes on.

THE COURT: Well, I'm going to tell you, you will call the Sheriff and have the Sheriff come down because immediately upon Mr. Picerno leaving the courtroom I am going to have him arrested and put in jail for contempt of court. Call the Sheriff and have him come down.

MR. PICERNO: Okay. Can I use the phone before you do that … ?

THE COURT: Yes.

While waiting for the jury to arrive, Picerno presented his investigator's testimony concerning the work he had done preparing for trial and what still needed to be done. The investigator also testified of the extensive demand on him and the public defender's office to prepare other trials during the previous two months. Picerno then told the court:

Judge, just if I may finally just say to the Court, I think if I recall correctly, from Thursday when we had this discussion and you overruled my first motion for continuance, I remember you making the comment to the effect that the office of the Special Public Defender is not going to dictate to you how the docket's going to be called or run or something to that effect. . . .

I think that you may be feeling some frustration in terms of the docketing system and in terms of getting cases to trial and I can tell you that I am personally not unsympathetic to that point of view and I can understand some of the judge[']s frustrations. And I just want to let you know that the reason that I am taking the position that I am taking today is because I only had one thing in mind and that is to make sure that [the defendant] gets a fair trial and it seems like [the defendant] is here and caught in this predicament by happenstance. It had very little to do with him. The conflict that arose between him and his prior attorney may or may not have been his fault, I don't know about that situation.

In any event I have only been representing him since May 3rd. It's a 298 page master file in which almost every report means something. I have got—I just received Friday approximately 30 new pages of discovery. Everything is detailed. I don't want to rehash everything that is in that motion for continuance but I just want to say that, you know, I took an oath and

that oath was that I would come into court and provide representation to somebody and for me to attempt to try this case now it would be, for lack of a better word, it would be a joke. He wouldn't get the representation that you or I or anyone else in his shoes would expect to have and I just don't feel like I can sit here through this and participate in this miscarriage of justice that would occur.

Just for the record, one thing that isn't on the record and not in my motion for continuance, we did take the depositions of the [two] victims and finished about 10:00 p.m. Friday night. I just received those depositions last night at about 6:00 p.m. and haven't had a chance to review those and I think that's really the only thing that's not on the record, not contained in the motion for continuance that I want to be in there and that's all that I'd like to say at this time.

THE COURT: All right. Mr. Picerno, with respect to your decision as to what to do or what not to do in defending your client is, of course, your professional decision. You are right that there is nothing personal in this matter as far as I am concerned. But one thing should be made clear to you. This court has ordered you to stay in this courtroom and to represent your client as you see fit. If you attempt to leave the courtroom, I am telling you I'm going to place you under criminal contempt and have the Sheriff take you into custody and incarcerate you until such time as you agree to remain in the courtroom. Now, with that view in mind, I am asking you are you going to leave the courtroom or are you going to stay here?

MR. PICERNO: Judge, before I answer that question, could I have time to consult with someone I have asked to come over to represent me?

THE COURT: You may.

OFF THE RECORD DISCUSSION

. . . .

THE COURT: Mr. Picerno?

MR. PICERNO: Yes, sir.

THE COURT: Have you finished conferring with your colleagues?

MR. PICERNO: I have.

THE COURT: What is your decision?

MR. PICERNO: Your Honor, my decision at this time is that if the Court is going to proceed with the trial in this matter that I still intend to leave the courtroom. I don't believe that I can be party to this type of a proceeding in which a man is going to be denied his right to a fair trial.

THE COURT: Mr. Picerno, if you persist in that, you are being, in my opinion, in intentional contempt of this Court and you will subject yourself to immediate incarceration and referral to the Disciplinary Committee. If I am in error in what I do here this morning, you well know that the Court of Appeals exists to reverse the action that I take. Your leaving this courtroom at this time in my opinion is a direct confrontation of my order for you to stay and I just want you to be very careful and understand as a lawyer and an officer of this Court what you are doing. That I am making it very clear that I am ordering you to stay in this courtroom and your participation is to be determined by your judgment only but the fact that you stay in the courtroom in no way waives your position in this case. And all you will be doing in my opinion by attempting to leave this courtroom is causing me to take the action that I have indicated. Do you understand my position?

MR. PICERNO: I do.

THE COURT: Is it still your determination to leave the courtroom?

MR. PICERNO: I'd like to say a couple of things.

THE COURT: Very well.

MR. PICERNO: For the record. One of the things being in response to you saying that I am not going to be waiving any of my position by remaining silent throughout the trial or just sitting here unprepared. I have consulted with a couple of attorneys, one of which was involved in a similar situation in which the Court of Appeals did affirm the conviction of someone that he sat silent throughout the course of the trial. That's one response.

The other response is Judge, that if it means for me to be a lawyer and officer of the court that I have to participate in what would occur in this courtroom this week then I feel very strongly that probably I don't really want to be a lawyer that bad and that I can find something else to do for a living.

THE COURT: Well, I just want you to be very clear as to what you are doing. In my opinion, you are not waiving any of the rights. Either I am right or you are right[,] and if you are right, that's why the Court of Appeals exists. I want you to understand that I think you are personally placing your professional career in jeopardy and that this, in my opinion is foolish but the decision is [yours]. I just want it to be clear that you are doing this on your own.

MR. PICERNO: One other thing. The reason that I am basing this decision on is by the time the Court of Appeals gets around to deciding this case, [the defendant] would be incarcerated in the Missouri Department of Corrections and to me, that's unacceptable. We need to come up with a solution beforehand.

THE COURT: Very well. Make your decision.

MR. PICERNO: On the docket problem.

THE COURT: If you are to leave the courtroom, do it now. If you are going to stay or remain silent or do whatever you want to do, that's purely up to you and make your decision now.

MR. PICERNO: Okay. I intend to leave the courtroom.

THE COURT: Very well. Mr. Sheriff, if Mr. Picerno attempts to leave this courtroom, place him in custody and we will make out an order of commitment and you may keep him in the witness room until such time as I tell you to transport him across the street.

Picerno left the courtroom, and a sheriff's deputy arrested him. Four hours later, the court reconvened. Picerno appeared with his attorney, Bruce Simon. At the hearing, Mauer asked Simon:

THE COURT: [A]re you prepared to tell me whether or not your client has changed his mind about whether or not he's going to stay in the courtroom or not?

MR. SIMON: Yes, Your Honor. I have discussed that with my client and I have suggested with full awareness of the fact that it's his decision that he remain during the pendency of these proceedings. He has elected not to participate affirmatively in the trial of this case for reasons which I would like to make a little clearer.

THE COURT: Does that mean he's still refusing to stay in this courtroom during the proceedings?

MR. SIMON: That is correct, Your Honor.

THE COURT: There's a big difference between participating affirmatively and staying in the courtroom.

MR. SIMON: Well, I believe the issues are not that far apart. I can see that there is a difference but what we are really talking about is effective [Sixth] Amendment representation and that's an issue that I will get to in a moment but in answer to the Court's specific question, Mr. Picerno's informed me that he will not participate in these proceedings and will not remain in the courtroom while these proceedings are . . . going on.

. . . .

. . . When confronted with the possib[i]lity of simply remaining in court on a stand by basis or an advisory basis, I think that's a decision that [the defendant] has to make whether he wants to undertake the defense of this case himself. I am told that he does not. That puts the burden on Mr. Picerno to represent [the defendant] as effectively as he can under the circumstances.

. . . It's my present belief that my client's position is reasonable. He refuses to be simply a warm body with a law license while this case is being tried. He does not and deeply regrets the actions which he has suggested he will take if compelled to go to trial with this case. It is not a matter of contempt. It is a matter of his unwillingness to say I will be a part

of a process which I have not had adequate time to prepare.

. . . .

... Mr. Picerno is simply unwilling to be a participant in a criminal proceeding representing a criminal defendant when he believes in his own professional judgment that he is not prepared to go to trial and he has not had adequate time to prepare the case for trial.

. . . .

... Mr. Picerno is reluctant, extrem[e]ly reluctant to enter into a procedure where he is going voluntarily into contempt but he feels he has no alternative because he does not believe that he can adequately represent [the defendant]. [The defendant] has indicated he does want the services of an attorney in connection with this matter and what Mr. Picerno is really saying is that if you will give me some additional time, Judge, I will be ready, able and willing to try this case but I will not sacrifice [the defendant's Sixth] Amendment rights in order to proceed to trial when in my judgment or in his judgment, he is not prepared to do so and has not had adequate time.

The defendant told Mauer that he was not willing to waive his right to counsel and that he refused to represent himself. He said, however, that he agreed with Picerno's actions.

Mauer then announced:

The issue is clear. Once the Court has made [its] decision with respect to whether or not to proceed with trial, the responsibility for exercising this discretion is upon the Court's shoulders and not upon Mr. Picerno's shoulders.... As I understand ... your client's position, Mr. Simon ... because this was done once before with the attorney staying in the courtroom and it was not reversed, he feels that staying in the courtroom might make a difference in my decision being made now which I doubt very strongly. Because my decision is to proceed, because the State is ready to proceed and because the issue is a direct violation of a clear decision of this Court and a clear order of this Court, Mr. Picer-

no, as an officer of this Court is in violation of this order. I'm presuming it's going to be the same and I have been advised of course that a writ of habeas corpus will be sought and so my judgment is that Mr. Picerno is in direct criminal contempt of this Court by refusing and continuing to refuse the order of this court that he stay in this Court while these proceedings are going on.... It's further this Court's further decision that based upon the fact that in some large measure ... this decision was brought about by the acts of the defendant himself in having [three] different counsels. I know not and the record is not clear as to why the first counsel had to withdraw on this case but the record is very clear that the second counsel Mr. Kenton Hall who also is present in this courtroom today had to withdraw because of the voluntary filing of a 1983 action in Federal Court which mandated his withdrawal from this case. So the decision is not just whether or not we proceed with the notice that we have had here. The decision is that this is based upon the fact that this case has been on file for over a year with the defendant incarcerated and we are all aware of the problems with the jail also. And for this and other reasons, I have made my decision that Mr. Picerno should remain in the courtroom so that if in effect he did change his mind, that counsel would be available for him to confer with at any time during these proceedings.

Mauer also said that he was not ordering Picerno to participate in the trial in any particular degree.

Mauer ordered Picerno to serve 15 days in jail. He ordered Jennifer Brewer, who originally was to "second chair" Picerno during the trial, to remain in the courtroom to answer the defendant's questions during his trial. The court also noted that Picerno had affirmed his understanding that the act of leaving the courtroom would be deemed contemptuous.

On July 11, Mauer issued an order of commitment remanding Picerno to the custody of the Jackson County Department of Corrections for 15 days or until otherwise

discharged in accordance with the law. Mauer stayed the order for 48–hours so Picerno could seek a writ of prohibition from this court. On July 12, Picerno filed his petition for writ of prohibition with this court. We issued a preliminary writ of prohibition on that same day. He contends that Mauer exceeded his jurisdiction because the facts on which Mauer relied did not constitute direct criminal contempt and because his conduct was not contemptuous.

■ Criminal contempt stems from a court's inherent power to protect the judicial system established by the people as the proper and official method of settling disputes. *State ex rel Burrell–El v. Autrey,* 752 S.W.2d 895, 898 (Mo.App.1988). "Without this power courts are no more than advisory bodies to be heeded or not at the whim of the individual." *Teefey v. Teefey,* 533 S.W.2d 563, 566 (Mo. banc 1976). A court has inherent power to punish contemptuous acts and to preserve and vindicate the law's power and dignity. *Burrell–El, id.* Disobedience of a valid judgment or court order which the court has jurisdiction to enter is such an interference with the administration of justice as to constitute contempt. *State v. Koon,* 356 Mo. 284, 201 S.W.2d 446, 455 (1947).

Section 476.110, RSMo 1994, grants every court of record the power to punish for criminal contempt persons who are guilty of:

(1) Disorderly, contemptuous or insolent behavior committed during its session, in its immediate view and presence, and directly tending to interrupt its proceeding or to impair the respect due to its authority;

(2) Any breach of the peace, noise or other disturbance directly tending to interrupt its proceedings;

(3) Willful disobedience of any process or order lawfully issued or made by it;

(4) Resistance willfully offered by any person to the lawful order or process of the court;

(5) The contumacious and unlawful refusal of any person to be sworn as a witness, or, when so sworn, to refuse to answer any legal and proper interrogatory.

Rule 36.01(a) says, "A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court."

■ A court can punish contempt summarily, without notice and a hearing, only if it is direct—that is, it occurs in the court's presence or so near as to interrupt its proceedings. *State ex rel. Shepherd v. Steeb,* 734 S.W.2d 610, 611 (Mo.App.1987). "If the judge certifies that he or she saw the conduct constituting contempt, a direct contempt may be punished summarily." *State ex rel. Chassaing v. Mummert,* 887 S.W.2d 573, 578 (Mo. banc 1994); Rule 36.01(a). Contempt is deemed indirect if it arises from matters occurring outside the court but which tend to degrade or make impotent the court's authority or impede or embarrass the administration of justice. *Id.* The punishment for contempt is a fine or imprisonment at the discretion of the court. Section 476.120; *Burrell–El,* 752 S.W.2d at 898.

■ Picerno first argues that Mauer improperly based part of his contempt order on conduct which occurred outside the courtroom. He admits that his refusal to remain in the courtroom occurred in Mauer's immediate view and presence, but he argues that Mauer's decision was swayed by previous conduct which occurred outside of the courtroom.

Near the close of the hearing, Mauer said:

Now, one further comment on the record with respect to this matter. The State has indicated to me previously that this problem has cropped up in the past in other divisions, specifically Division No. 8 and the record should reflect that I personally did discuss this matter with Judge [Lee E.] Wells over the lunch hour or just before the lunch hour and he informed me that he did have problems with Mr. Picerno in the last term of court. In fact, it went so far as to have Mr. Peter Sterling of the State Public Defender's office appear in his court in an informal conference in chambers and according to Judge Wells, the matter—it was asked at that time that the matter be handled administratively.

So not exactly the same but similar events have happened. My intent in making this ruling is I believe that the issue of the Court's ability to control the docket is involved and I think it's time that we have a very definitive decision from the Court of Appeals with respect to these matters.

Mauer made other references to problems with attorneys in the Public Defender's Office being habitually unprepared for trial. He listened to comments by the prosecutor suggesting that Picerno habitually refused to prepare for trial.

Picerno argues that Mauer's basing part of his contempt order on past conduct will not support a finding of direct criminal contempt, and the matter should have been treated as a case of indirect contempt. We disagree that Mauer based his contempt order on conduct which did not occur in his presence.

Mauer's findings of fact and order are clear that Picerno's contemptuous conduct was his refusal to remain in the courtroom. Mauer's decision to order Picerno to remain may have been motivated by Picerno's previous conduct, or Mauer's perception of Picerno's previous conduct. It makes no difference. Picerno's past conduct may have made Mauer less patient with him, but, in any case, Mauer held Picerno in contempt for refusing to remain in the courtroom, not for his previous conduct.

We sympathize with public defenders for the workload they must undertake. The issue of this case, however, is not the public defenders' workload—or even docket control. The sole issue in this case is whether Picerno committed direct contempt. His refusal to remain in the courtroom was direct contempt of Mauer's order.

Picerno responds that "[t]he focus is the conduct which is the gravamen of the contempt charge, not necessarily the action as alleged in the order. *Steeb*, 734 S.W.2d at 612." In *Steeb*, the judge held an attorney in contempt because of statements the attorney made about the case to a newspaper reporter. The statements obviously were outside the judge's presence and constituted indirect contempt. The judge argued to the *Steeb* court that the contempt was direct because the attorney lied to him in his presence about talking to the reporter. The *Steeb* court responded that the true basis for the contempt order was the attorney's talking to the reporter.

The true basis for Mauer's order was Picerno's refusal to remain in the courtroom. Picerno could have avoided Mauer's contempt order by remaining in the courtroom. Mauer required nothing more of him.[2] The gravaman of Mauer's order, therefore, was Picerno's refusal to remain in the courtroom. The other matters concerning prior acts and "docket control" were pertinent only to explaining perhaps why Mauer "drew the line" where he did in ordering Picerno to stay in the courtroom.

Picerno argues in the alternative that his conduct was not contemptuous because he merely was following the ethical rules of professional conduct. He contends that his refusal to proceed to trial was based on his personal knowledge and belief that he was not competent to represent the defendant effectively. He argues that forcing him to proceed to trial would violate his ethical obligation to assure competent representation for his client and his obligation to protect his client's constitutional rights.

 Missouri's judicial system has an effective remedy for ineffective assistance of counsel. Rather than follow this course, Picerno took matters into his own hands in defiance of Mauer's order. Mauer properly refused to tolerate it because "the direct order of the trial judge fixes the limits of proper advocacy." *State ex rel. Tannenbaum v. Clark*, 838 S.W.2d 26, 34 (Mo.App. 1992). "If the ruling is adverse, there is no right of counsel to resist or insult the judge." *Id.* "Any attack on the propriety of the order must be by judicial process and not willful disobedience." *State ex rel. Girard v. Percich*, 557 S.W.2d 25, 38 (Mo.App.1977). "Until the judgment of a court is set aside by such court upon reconsideration, or is re-

---

**2.** Mauer ordered Picerno to remain so he could answer the defendant's questions, but Mauer made clear that he was not requiring Picerno to do anything more than to remain. Picerno was free to decide to what degree he would participate.

versed for error upon orderly procedure, its orders must be respected by full obedience." *Id.* "The prime purpose of the writ of prohibition is to prevent a usurpation of judicial power and not to provide a remedy for all legal difficulties or to serve as a substitute for appeal." *Burrell–El,* 752 S.W.2d at 902.

Picerno also claims that he was justified in disobeying Mauer because Mauer's order was "transparently invalid." Picerno complains that it would have forced him to violate the ethical rules of professional conduct and his client's constitutional rights. We disagree.

Picerno bases his argument on *In re Providence Journal Co.,* 820 F.2d 1342 (1st Cir. 1986), *modified on reh'g en banc,* 820 F.2d 1354 (1st Cir.1987), *cert. dismissed sub nom., United States v. Providence Journal Co.,* 485 U.S. 693, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988). In that case, the court recognized a limited exception to the general rule that a party may not violate a court order and later raise the issue of its unconstitutionality collaterally as a defense in a criminal contempt proceeding. In doing so, the court said, "Rarely will a party be subject to a transparently invalid court order." *Id.* at 1353. The court also admonished, however, that "even when a party believes it is subject to a transparently invalid order, seeking review in an appellate court is a far safer means of testing the order. For if the party chooses to violate the order and the order turns out not to be transparently invalid, the party must suffer the consequences of a contempt citation." *Id.* at 1353. On rehearing *en banc,* the court modified its opinion to clarify that even if a party believes an order is transparently invalid, he or she must first make a good faith effort to seek emergency relief from an appellate court. *Id.* at 1355.

Not only did Picerno not face a transparently invalid order, he did not face an *invalid* order. Mauer's ordering Picerno to remain in the courtroom did not violate either the defendant's constitutional rights (letting Picerno leave certainly was a greater threat to them) or conflict with Picerno's compliance with professional rules of conduct. Picerno satisfied the constraints of the rules of professional conduct when he emphatically informed the court of how ill-prepared he believed that he was and when he zealously sought a continuance.

■ Obeying a judge's order after protest and after exhaustively seeking relief by extraordinary writ can never be deemed to violate rules of professional conduct. He overlooks the preamble to Rule 4 governing professional conduct which says, "While it is a lawyer's duty, when necessary, to challenge the rectitude of an official act, it is also a lawyer's duty to uphold legal process." Even in a case cited by Picerno, *Maness v. Meyers,* 419 U.S. 449, 458, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975), the United States Supreme Court said that "all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal."

Whether a judge's order violates a defendant's constitutional rights is a matter for this court and other, superior tribunals to decide. Whatever constraints Picerno may feel the rules of professional conduct impose on him, he must understand that they do not require him to assume the burden unilaterally of deciding when his clients' constitutional rights have been violated.

Picerno seeks to justify his position by emphasizing the holding of the *Maness* decision. The Supreme Court ruled in that case that a lawyer had not acted with contempt for advising his client to refuse, on Fifth Amendment grounds, to produce materials demanded by a subpoena *duces tecum* because the lawyer believed in good faith that the material might incriminate his client. The action taken by the attorney in *Maness* is a far cry from that taken by Picerno. Unlike the attorney in *Maness,* Picerno was not advising his client in good faith of what the law required of him. Picerno unilaterally decided that Mauer's denial of a continuance was violating his client's constitutional rights so he defied Mauer's lawful, direct order. Picerno told the court that he was concerned that in a previous case this court had affirmed the conviction of an attorney who obeyed an order similar to Mauer's order.

Picerno did not identify the case. Assuming that a Missouri appellate court did issue such a holding,[3] Picerno's taking this position demonstrates that he knew that his views of the constitutional issues were not shared by the appellate courts. We fail to discern how he can justify such unilateral action as taken in good faith.

Picerno also claims that he cannot be found in direct contempt of court because Mauer did not specify what conduct he expected of Picerno. This is simply wrong. Mauer made abundantly clear to Picerno that, no matter what else he did, he had to stay in the courtroom. That was all; he was not to leave.

Mauer said, "[O]ne thing should be made clear to you. This court has ordered you to stay in this courtroom and to represent your client as you see fit. If you attempt to leave the courtroom, I am telling you I'm going to place you under criminal contempt and have the Sheriff take you into custody and incarcerate you until such time as you agree to remain in the courtroom." Mauer was leaving the amount of Picerno's participation in the defendant's trial to Picerno's professional judgment. Mauer told him that he was not ordering him to participate to any degree, but he wanted him in the courtroom so, should the defendant want to ask him about the law, Picerno could decide whether to answer. Mauer told him again, "I am making it very clear that I am ordering you to stay in this courtroom and your participation is to be determined by your judgment only but the fact that you stay in the courtroom in no way waives your position in this case." At still another point, Mauer noted that "[t]here's a big difference between participating affirmatively and staying in the courtroom."

Picerno acknowledged that he understood this. In explaining his actions to Mauer, Picerno acknowledged that he understood the court to believe that he would not "be waiving any of my position by remaining silent throughout the trial[.]" He knew that all that Mauer had ordered him to do was to remain in the courtroom. His attorney said at one point, "[Picerno] refuses to be simply a warm body with a law license while this case is being tried."

A contempt conviction is not subject to attack on the ground that the order was vague where the contemnor has engaged in the conduct proscribed in the order. *Girard,* 557 S.W.2d at 38.

Picerno also claims that his conduct was not contemptuous because he did not act with disrespect or intend to degrade the court. Picerno may have been polite in his defiance, but he willfully disobeyed. He was defiant. This implies bad faith. *Koon,* 201 S.W.2d at 455. "If parties make themselves the judge of the validity of a court order regularly entered respecting their conduct or course of action, then the courts become impotent and judicial power becomes a mockery." *Girard,* 557 S.W.2d at 38.

A writ of prohibition lies only to prevent a lower court from acting without or in excess of its jurisdiction. *State ex rel. Police Retirement System v. Mummert,* 875 S.W.2d 553, 555 (Mo. banc 1994). As officers of the court, lawyers have a duty to obey judicial orders and uphold legal process. Picerno's refusal to remain in the courtroom despite a clear order to do so constituted a blatant disregard for his sworn duty to uphold the legal process. Moreover, his conduct caused an interruption in the court's proceedings and a delay in the administration of justice.

Mauer did not exceed his jurisdiction. We sustain the order of contempt and quash our preliminary order in prohibition.

SMITH, J. concurs.

LAURA DENVIR STITH, J., files separate dissent opinion.

LAURA DENVIR STITH, Judge, dissenting.

While I agree with most of the principles set out by the majority and argued by the State, I nonetheless must dissent for the reasons set out below.

---

**3.** Picerno gave no citation for such a case. We do not discern any benefit in searching for it.

### A. Attorneys Must Obey the Orders of the Trial Judge

I fully share the concern of the majority, and of Judge Mauer, that attorneys cannot be their own judge. If the judge overrules an attorney's objection, then in almost every instance the attorney's only remedy is to seek a writ or to make his or her record and then raise the issue on appeal. An attorney's legal and ethical obligation to represent his client's interest within the bounds of the law does not require more. If the attorney nonetheless simply ignores the trial judge's order because the attorney thinks the order is wrong, the attorney is subject to being found in contempt. Even if the order is later determined to be invalid, it will not void the contempt.

The rationale behind this principle, which is often termed "the collateral bar rule" was well set out by the United States Supreme Court in *Maness v. Meyers*, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975), as follows:

We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.... Remedies for judicial error may be cumbersome but the injury flowing from an error generally is not irreparable, and orderly processes are imperative to the operation of the adversary system of justice.

*Id.* at 458–60, 95 S.Ct. at 591–92.

I also share the view expressed by Judge Mauer below that it is the trial judge, not the attorneys, who must control the court's docket. In determining his docket, the trial judge will of course take into consideration the workload of the attorneys who appear before the judge and the seriousness of the case in deciding whether to grant a continuance.

In this case, however, Judge Mauer believed based on his own experience and on the experience of other judges that the case could have been properly prepared for trial had adequate attention been given to it, and that the claim of failure to be adequately prepared was not a result of the complexity of the case but was simply a strategy on the part of the public defender to avoid and delay trial. If so, it was not incumbent on Judge Mauer to grant a continuance, for, as the Judge noted, it is he, not the prosecutor or the public defender, who must control the court's docket. Moreover, if, at a hearing on indirect contempt, Judge Mauer's concerns proved to be justified, he could well have found Mr. Picerno in contempt.

Here, of course, no such hearing was held, for the simple reason that Judge Mauer determined that Mr. Picerno was guilty of direct rather than indirect criminal contempt for leaving the courtroom in contravention of Judge Mauer's order that he remain. I again agree with the majority, and with the position taken by the State in this Court in support of Judge Mauer, that an attorney can be held guilty of direct criminal contempt if he simply walks out of court in direct defiance of a judge's order that he remain. I disagree with the State, and with the majority, that this is the issue with which we are presented, however. It is for this reason that I dissent.[1]

### B. The Contempt Was Indirect Because Judge Mauer Chose to Base His Contempt Determination on Matters Which Occurred Both Outside and Within His Presence

The key issue as to which the majority and I disagree is whether Mr. Picerno was cited for direct contempt. The majority says that this is the case because the contempt order itself says it is based only on Mr. Picerno's decision to leave court in violation of the judge's order that he remain.

I disagree. My review of the record convinces me that, in this instance, the basis for

---

1. My work and that of the majority have been made much easier by the truly excellent quality of the briefing and argument by counsel for the State and for the Relator. I commend both counsel for their clear and thoughtful presentation of the issues.

the finding of contempt was not merely limited to Mr. Picerno's unauthorized exit from the courtroom. To the contrary, Judge Mauer himself stated on the record that he believed he was entitled to consider matters which had occurred outside his presence in determining whether Mr. Picerno's conduct constituted direct criminal contempt.[2] It was for this very reason that he actually *overruled* Relator's objection to evidence of past occasions on which either Relator or another public defender were also alleged to have come to court unprepared to try their cases, stating:

> Because it is contempt I think that you will agree with me that the cases indicate that you can even go broader than those issues. That *sometimes even matters outside the record become relevant to my ultimate determination of contempt.* And for that purpose, I will hear what she has to say.

(emphasis added).

Similarly, the Judge repeatedly indicated that he believed the true issue was broader than simply whether Mr. Picerno was prepared, and included whether the Court or the Public Defender would "control the Court's docket." At one point, the Judge stated:

> My intent in making this ruling is I believe that the issue of the Court's ability to control the docket is involved and I think it's time that we have a very definitive decision from the Court of Appeals with respect to these matters.

The majority suggests that these issues never became the basis of the order of contempt, and thus we should ignore them. While I agree that none of these matters should have been considered if the issue were one of direct contempt, Judge Mauer's own words show that they were considered. In fact, even the State's arguments on appeal demonstrate (albeit inadvertently) the interrelationship of the order of contempt and of the Public Defender's office's alleged repeated failure to prepare for trial. The State argues, for instance, that the ruling should

be affirmed in part in order to teach the Public Defender it cannot control the court's docket, stating Relator's:

> refusal to accept the Respondent's order denying a continuance is reflective of an attitude demonstrated in the past by members of the office of Special Public Defender and the office of Public Defender.... Such information is relevant in light of Relator's declarations on the record that his conduct was not intentional and that he had not refused to proceed to trial in the past. Respondent reiterated that his intent in making his ruling was to demonstrate the court's ability to control its docket.

In other words, assuming that Judge Mauer would be within his authority in basing a finding of direct contempt solely on the matters which occurred in his presence, that is simply not what he did. Rather, he specifically indicated that he believed he was entitled to consider matters which occurred outside of his presence in determining whether the contempt was direct or indirect in nature, and then proceeded to do just that. The Judge specifically addressed the actions of Mr. Picerno not only in front of Judge Mauer himself, but also his actions (or, more accurately, his inactions) in preparing for trial of this case, and his alleged failure to adequately prepare for hearings before other judges in the past.

Because conduct outside the presence of the Court was in fact considered by the Court in ordering Relator to remain in the courtroom, in denying his request for continuance, in determining that the act of leaving the courtroom was contemptuous and in setting a punishment therefor, I conclude that any contempt was at least in part indirect. Judge Mauer should have followed procedures applicable to indirect criminal contempt. *Osborne v. Purdome,* 244 S.W.2d 1005, 1011–12 (Mo. banc 1951), *cert. denied,* 343 U.S. 953, 72 S.Ct. 1046, 96 L.Ed. 1354 (1952). As it is uncontested that Mr. Picerno was not given the type of notice and opportu-

---

**2.** While the Contempt order itself refers only to an act committed in the Judge's presence, we are not limited to consideration of the order itself in determining whether the contempt was direct or indirect. Rather, it is appropriate for us to look at the transcript to determine whether the act which occurred was in fact contemptuous, and if so whether it constituted direct or indirect criminal contempt. *Cf. State ex. rel. Tannenbaum v. Clark,* 838 S.W.2d 26, 31 (Mo.App.1992).

nity to prepare a defense required for indirect criminal contempt (for instance, he did not have the opportunity to show that the allegations about his lack of preparation lacked validity or could be reasonably explained), I would reverse.

### C. *The Condemnor Was Not Told the Conduct Alleged to Be Contemptuous with Sufficient Specificity So as to Support the Determination of Direct Criminal Contempt*

Even were the criminal contempt properly classified as direct, the contempt order should be reversed. The procedures to be followed in a case involving direct criminal contempt are well summarized in *State ex. rel. Burrell-El v. Autrey*, 752 S.W.2d 895 (Mo.App.1988). Of particular importance here is the requirement that:

> (1) After determining that summary contempt is necessary, *the court shall advise the contemnor as to exactly what act or conduct is contemptuous, and the contemnor should be asked whether he knows the act is contemptuous and if there is any reason or excuse for the act or conduct.*

*Id.* at 899 (emphasis added). *Burrell-El* admonishes that "[t]he proper procedure is 'absolutely necessary' to any punishment for contempt," *Id.* at 898, and "Where there is no order or judgment of contempt reciting the precise facts, a contempt cannot be upheld." *Id.* at 899.

Here, there is no question that Judge Mauer's Order of Contempt and Order of Commitment contained great detail, and specifically set out an act—refusing to remain in the courtroom despite a direct order to do so—which the Order states formed the basis of the contempt. My review of the transcript convinces me that Judge Mauer did not simply order Mr. Picerno to remain in the courtroom, however. Rather, he ordered him to remain in the courtroom *in order to represent Mr. Hamilton in some capacity.* In fact, the State takes the position in its brief in this Court that this is the very reason that Mr. Picerno's conduct was contemptuous, stating:

> Relator's actions clearly caused actual, direct obstruction of and interference with the administration of justice. As a direct result of Relator's contemptuous acts, the criminal trial, which was number one on the court's docket, could not be held.

Of course, Relator's act of walking out of the courtroom in no way prevented Mr. Hamilton's trial from being held. What prevented the trial from being held was Relator's refusal to act as counsel because of his claimed incompetence to do so, and his later refusal to remain in the courtroom to represent Mr. Hamilton in some lesser manner when Judge Mauer ordered the trial to proceed despite Mr. Picerno's refusal to act as counsel.

True, as the majority notes, Judge Mauer at various points indicated that he left it to Mr. Picerno to decide in what capacity he would represent Mr. Hamilton. Judge Mauer also at times indicated that whatever the capacity in which he chose to act, Mr. Picerno would be considered as Mr. Hamilton's counsel if he remained and that it was because Mr. Picerno would be present in some capacity as counsel that the trial would proceed.

Thus, at various points, Judge Mauer indicated that Mr. Picerno should: (1) remain and "do your best to represent this man as an officer of the court;" (2) sit in the courtroom during the case; (3) "stay in the courtroom and represent your client as you see fit;" (4) "stay in this courtroom and your participation is to be determined by your judgement only;" (5) "Stay or remain silent or do whatever you want to do;" (6) remain in the courtroom and be available to answer questions "not ordering that he participate in the trial in any particular degree other than to answer questions of the defendant;" and (7) stay in the courtroom, which the Judge said would mean Mr. Picerno "has to represent him [defendant] as he sees fit."

For these reasons, I do not believe the order of direct criminal contempt was sufficiently specific as to the conduct required of Mr. Picerno in order to avoid contempt. He was not offered the opportunity of avoiding contempt by doing what the contempt order recites—that is, simply remaining in the courtroom. It may be that Mr. Picerno

would have been willing to stay in the courtroom as an observer. All we know is that he was not willing to stay to act as "standby" counsel or in some other role as counsel for Mr. Hamilton.

I do not mean to suggest that Judge Mauer could not hold Mr. Picerno in contempt for refusing to stay and act in some capacity as counsel for Mr. Hamilton, or so as to be available to answer Mr. Hamilton's questions. I simply would hold that this is not the conduct which is recited in the order, and, as noted above, "[t]he proper procedure is 'absolutely necessary' to any punishment for contempt," *Burrell-El,* 752 S.W.2d at 898, and "Where there is no order or judgment of contempt reciting the precise facts, a contempt cannot be upheld." *Id.* at 899. Here, the order was insufficiently specific and definite to form the basis for a finding of direct contempt.

For these reasons, I would make the writ absolute because I believe the basis for the contempt was at least in part indirect contempt and because the finding of contempt did not completely state the conduct on which the contempt was actually based.